# Exhibit 1

## Affidavit of Bobby M. Moore

1. My name is Bobby M. Moore. I am currently employed as a paralegal at the law offices of Baird & Baird in Pikeville, Kentucky.

2. Between approximately October 2024 and February 2025, I worked for the law offices of Glenn Hammond in Pikeville, Kentucky. I obtained my paralegal certificate while working for Glenn Hammond.

3. In mid-June 2025, I heard from a friend and former co-worker at Hammond's office about a complaint filed by 3M against Glenn Hammond. I informed my friend that I would be willing to provide information to anyone who was interested in learning about misconduct that I observed while working at Hammond's office. I understand that my friend reached out to 3M.

4. On the evening of Thursday June 19, 2025, I met with a lawyer and investigator for 3M. They advised me that they represented 3M, were not interested in learning any privileged information, but wanted to hear anything that I was aware of regarding improper, illegal, or unethical conduct relevant to the case filed by 3M against Hammond and others. I agreed to speak with the 3M representatives and provided a summary of information known to me.

5. I have set forth below some of the information known to me and communicated to 3M representatives. I could provide additional information and details if asked.

6. While working at Hammond's office, I saw and heard Glenn Hammond tell clients to lie about facts pertinent to lawsuits Hammond filed on their behalf. This occurred often, virtually on a daily basis. Hammond sometimes instructed clients to ignore their church's teachings and instead focus solely on what is good for their family in terms of making money from lawsuits. I found this to be deeply disturbing.

7. While working at Hammond's office, it was common for Hammond to direct employees to not put dates on documents so that the documents could be later dated in order to avoid statute of limitations issues. Mr. Hammond told me that one of the reasons to not date documents had to do with statute of limitations issues. At the time, I asked my paralegal instructor about this as a "hypothetical practice" and was advised it was not proper.

8. While working at Hammond's office, I saw Hammond pursue many cases after the statute of limitations had been clearly exceeded.

9. While working at Hammond's office, myself and other staff were regularly told by Hammond to tell clients that their cases were "moving along" and "going along fine" when in reality they were not. Sometimes the cases had even been dismissed or were not filed at all. I did not like telling clients things that were not true about their cases.

10. While working at Hammond's office, I sometimes assisted with intakes of potential new cases related to 3M's dust masks. I found it odd that Hammond and his staff would show miners 3M dust masks rather than ask them what masks they wore. Based on my

observations, it seemed to me that Hammond and the staff were suggesting that the clients should say they wore a 3M mask when in reality they did not.

11. While working at Hammond's office, myself and other staff were instructed to copy and paste notary sections of documents onto other documents to make those documents appear to have been signed and notarized on a particular date, when in reality they were not.

12. While working at Hammond's office, I regularly observed documents that appeared to have been altered to change the dates, signatures, or notary information.

13. While working at Hammond's office, on one occasion, I was directed by a co-worker, Chuck McKinney, to take various documents and cut and paste signatures or dates onto a new document and then copy that document to make it look like an original. This appeared to be creating fraudulent documents.

14. While working at Hammond's office, I was often in charge of obtaining information from clients to fill out interrogatory responses. On numerous occasions, I would draft the interrogatory response based on information provided to me by the client and then Hammond would change the information to make it untruthful and more favorable to the client.

15. While working at Hammond's office, on at least two occasions Hammond coerced me and other employees to sign false statements. On one occasion, I had observed Hammond having an affair with a married employee in the office. At some point, that relationship blew up and she left the firm. Hammond required myself and other employees to sign a statement saying that we had not seen them engaging in a romantic relationship, when in reality I had. Hammond said that we would not get our paychecks if we did not sign the statement. On another similar occasion, Hammond coerced me to sign a false statement saying that I had information about an attorney in the office when I was not even employed at the same time as that attorney. Again, Hammond coerced my signature by threatening to withhold my paycheck. I also observed this practice with respect to other employees.

16. While working at Hammond's office on October 30, 2024, I was working alongside Chuck McKinney when McKinney asked me to go with him to a storage unit at 616 Bypass Road in Pikeville, Kentucky. I do not recall the exact storage unit number of the facility but I did provide 3M's lawyers with a photograph of the location. When I went inside the unit, I saw that there were dozens of large banker boxes containing 3M case files. I later observed that some of those files contained the name "Mike Martin." While at the storage unit, McKinney told me that nobody else knew these files were in the storage unit and that I should not talk about the files. I do not know the full story, but McKinney explained that someone had come into Hammond's office and seen information that Hammond did not want seen and as a result Hammond told McKinney to take these files to the storage unit.

17. While working at Hammond's office, I saw that there were still some 3M files in the office, and on Hammond's office's electronic system. The electronic files related to 3M were protected such that I could not access them, even when I worked in an IT role. Those files were, to my knowledge, the only ones with that level of restricted access.

18. Based on my experiences working with Hammond, I observed that Hammond used a cell phone and text messages to conduct business.

19. Based on my experiences working with Hammond, I believe that Hammond will destroy evidence to avoid discovery. While working at Hammond's office, I saw that Hammond employed a man to burn documents from the law office. I do not know the purpose of those burnings or the man's name, although I did observe that he drove a white van and I was told that he burned the files in his yard.

20. This statement was prepared with the assistance of lawyers. I have reviewed it, made edits, and ensured that each word was true and accurate.

21. I declare under penalty of perjury that the foregoing is true and correct.

6-23-25
Date

Bobby M. Moore