**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION**

**3M COMPANY,**

       **Plaintiff**

**VS.**

                                **Civil Action No: 7:25-cv-00037-REW-EBA**

**GLENN M. HAMMOND,
MICHAEL B. MARTIN, and
JOHN (a.k.a. "JOHNNY") GIVENS**

       **Defendants**

---

**DEFENDANT, JOHN ("JOHNNY") GIVENS', MOTION TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

---

NOW INTO COURT, comes Defendant, John ("Johnny") Givens (hereafter, "Givens") who moves pursuant to Federal Rule of Civil Procedure 12(b)(6) for dismissal of all claims against him brought by Plaintiff, 3M Company (hereafter, "Plaintiff" or "3M"). For the reasons set forth below, Plaintiff has failed to state a claim upon which relief can be granted, and Givens is entitled to dismissal of all claims against him.

**I.      Introduction**

Plaintiff, 3M, is a manufacturer of respirators or "dust masks" used by coal workers to reduce the risk of pneumoconiosis, colloquially referred to as "black lung disease." (R. Doc. 40 at pp. 9–10, ¶¶ 26, 28.) Defendant, John "Johnny" Givens is a Mississippi resident and an attorney who is barred in Mississippi and Kentucky. (*Id.* at p. 7, ¶18.) Givens and his co-defendants, Michael Martin and Glenn Hammond (collectively, "Defendants"), were co-counsel to nearly 850

1

plaintiffs in 22 separate claims across Kentucky all arising out of coal miners' use of 3M's respirators. (*Id.* at p. 12, ⁋34.)

Instead of defending these claims on the merits, 3M has improperly opted to unleash "the litigation equivalent of a thermonuclear device[]"[1] on Defendants by bringing this civil-RICO claim against them. In its Amended Complaint, 3M alleges that routine litigation activities Givens and his co-defendants performed, including meeting with clients, "obtain[ing] information from clients to respond to discovery requests, and prepar[ing] clients for depositions[,]" filing pleadings on behalf of plaintiffs and interacting with 3M's counsel, are tantamount to a racketeering enterprise. (*Id.* at pp. 12–13, ⁋37.)

Federal courts across the country have routinely condemned the use of civil RICO claims as a sword wielded by powerful corporations in an attempt to stymie free and open access to courts by plaintiffs' counsel. 3M is not a victim to a nefarious conspiracy concocted by Defendants with the aim of defrauding it out of millions of dollars; it is a corporate entity that produced a commodity that Defendants' clients relied on to varying degrees in the course of their careers as coal miners. To the extent that 3M refutes this contention, its recourse is through the defense of Defendants' clients' claims and the actionable judicial remedies available to it, such as sanctions.

The instant lawsuit is ill-founded and has no basis in law or in fact. Accepting the allegations in the Amended Complaint as true, this lawsuit is barred in its entirety by the *Noerr-Pennington* doctrine. Furthermore, if the Court reaches the merits of 3M's claims, it should have little difficulty concluding that 3M has failed to allege that Givens committed any cognizable predicate acts under RICO or actionable conduct under Kentucky common law based upon a broad body of jurisprudence which holds that litigation acts cannot constitute predicate acts under RICO

---

[1] *Gutterman v. Herzog*, No. 10-1081, 2020 WL 6728787 at *3 (E.D.N.Y. Nov. 16, 2020) (citation omitted).

and are protected conduct under Kentucky common law. Accordingly, for these reasons, this Court should dismiss all claims against Defendant Givens with prejudice.

## II.    Background

### A. Factual Background

Defendants, John Givens, Michael Martin, and Glenn Hammond, are three attorneys who entered into a Joint Venture Agreement in or around September 2020 to represent plaintiffs injured by the use of 3M's respirators or "dust masks" while working in Kentucky coal mines. (R. Doc. 40 at p. 14, ⁋ 38.) Defendants represented over 850 plaintiffs in such claims, which they brought in various state courts across Kentucky. (*Id.* at pp. 12, 16, ⁋⁋34, 44.) Defendant Hammond originated these lawsuits and referred them to his co-counsel, Defendants Givens and Martin, to jointly prosecute. (*Id.* at p. 14, ⁋38.) Givens keeps an office in Mississippi, and occasionally travels to Kentucky, where he previously defended clients' depositions in Hammond's office.  (*Id.* at pp. 8, 15 ⁋⁋ 18, 40.)

Through the litigation process, Defendant Givens learned that some of the cases referred by Defendant Hammond may not be legally viable, either by virtue of the applicable statute of limitations, or because the plaintiff did not use a 3M mask for a sufficient time period so as to give rise to a claim against 3M, and that Hammond either failed to properly vet these claims or intentionally pursued them and caused his co-defendants to pursue them notwithstanding their legal deficiencies. (*Id.* at 15, 48, 73 ⁋⁋41, 117, 155.) After it came to light that Defendant Hammond may have pursued, and encouraged his co-counsel to pursue, claims which he knew or should have known lacked merit, Defendant Givens distanced himself from Hammond and from the potentially baseless cases by filing motions to stay and/or motion to dismiss those claims. (*Id.* at pp. 15, 48, 72–73, 76–80, ⁋⁋41, 117, 154–56, 164–68.) On April 5, 2023, Defendants Martin

and Givens moved to withdraw as counsel from the hundreds of 3M dust mask cases they pursued alongside Defendant Hammond over the prior three years. (*Id.* at 85, ⁋178.)

In or around the end of March 2023, Defendant Hammond allegedly hid several banker boxes relative to 3M claims in a secret location, a storage unit in Pikeville Kentucky, to prevent their contents from coming to light. (*Id.* at 99, ⁋188.) Defendant Givens was not aware that Hammond removed them from his office and secreted them in a storage unit. (R. Doc. 11 at pp. 2–3.)

### B. Procedural Background

3M filed the instant lawsuit on June 13, 2025. (R. Doc. 1.) Two weeks after filing the Complaint, 3M filed Plaintiff's *Ex Parte* Motion (R. Doc. 11), through which it moved this Court to instruct the U.S. Marshal Service to seize and impound evidence that Defendant Hammond allegedly hid in a storage locker located at 616 Bypass Road, Pikeville, Kentucky. (*See* R. Doc. 11 at p. 1.) Relying on an affidavit executed by a former Hammond employee, Bobby Moore, 3M claimed that Defendant Hammond hid "dozens of large banker boxes full of 3M case files… [and] that nobody else knew these files were in the storage unit [except for two former Hammond employees] and that the fact of their existence should be kept secret." (R. Doc. 11 at pp. 2–3) (quoting the affidavit of Bobby Moore, internal quotation marks omitted).

3M has not alleged that Defendant Givens knew that Defendant Hammond hid documents or that they conspired with each other to conceal evidence in furtherance of any alleged enterprise. To the contrary, 3M has alleged that *no one*, including Defendant Givens, knew that Hammond moved these case files, and that Hammond intended for their existence to be kept secret. Despite the wholly unsubstantiated allegation that Givens was acting nefariously, 3M admits that Hammond denied Givens' request to view the files that Givens suspected were fraudulent. (R.

4

Doc. 11 at p. 4.) According to 3M, it was only after Defendants Givens and Martin saw the fraudulent files in Defendant Hammond's office that Hammond, acting alone and in his own self-interest, decided to move these documents to conceal them from discovery and obstruct justice. (*Id.*)

3M filed a First Amended Complaint on August 6, 2025. (R. Doc. 40.) Per the First Amended Complaint, the specific acts that 3M alleges Defendant Givens engaged in, which it contends constitute mail fraud and wire fraud include: "fil[ing] and prosecut[ing] over 850 civil claims against 3M in Kentucky courts in at least 22 separate complaints containing nearly identical allegations, language and structure and all filed (or later joined as counsel of record by filing an appearance) by each of the Defendants" (R. Doc. 40 at p. 12, ¶ 34); "regularly caus[ing] communications to be sent interstate through the mail and wires to their clients, to 3M, and to others in furtherance of their scheme indicating that Defendants were working together to provide legal representation in connection with civil actions against 3M[,]" (R. Doc. 40 at p. 12, ¶ 35); and "caus[ing] hundreds of filings to be made in Kentucky courts in which the signature line of such filings indicated that the Defendants were working together as part of the Enterprise[,]" (R. Doc. 40 at p. 13, ¶ 36). Further, 3M alleges that Givens individually

> performed day-to-day duties of managing and operating the Enterprise and was the work engine of the Enterprise who often assisted Defendants Hammond and Martin in executing each of their respective duties. For example, on information and belief, Givens often met with Enterprise clients, obtained information from clients to respond to discovery requests and prepared clients for depositions. Givens also prepared and filed pleadings on behalf of Enterprise plaintiffs, and at times interacted with 3M counsel in furtherance of the Enterprise.

(R. Doc. 40 at pp. 13–14, ¶ 37.)

3M alleges that Defendants acted fraudulently in a number of contexts, which generally can be classified as (1) making false statements regarding the extent to which individual coal

miners wore dust masks; (2) false statements about individual coal miners wearing 3M dust masks; (3) false statements about individual coal miners suffering from black lung disease; (4) false statements about the date upon which an individual coal miner first met with a Defendant, which is relevant to the statute of limitations;[2] (5) false statements about why Defendants voluntarily dismissed individual cases; and (6) false statements made to courts in an effort to conceal the existence of the scheme. (*See* R. Doc. 40 at pp. 19–22.) Additionally, 3M contends that Defendants failed to properly vet claims before filing and prosecuting them against 3M. (*See* R. Doc. 40 at pp. 24–27.) 3M also goes into painstaking detail as to allegedly false statements contained in various "Enterprise Complaints." (*See* R. Doc. 40 at pp. 27–48.) It also attacks Defendant Givens for allegedly filing notices of appearances and prosecuting claims on behalf of clients who never executed agreements permitting Defendant Hammond to associate Givens and/or Martin as co-counsel. (R. Doc. 40 at pp. 49–50.) 3M argues that Defendants, including Givens, caused false statements to be made and communicated to 3M during discovery, including information as to Defendants' initial meetings with clients, which could affect the statute of limitations, providing false information in answers to interrogatories, and advising their clients to provide false information during depositions. (R. Doc. 40 at pp. 52–56.) All of the allegedly fraudulent conduct 3M has accused Givens of relates to his representation of dust mask plaintiffs and occurred in the context of litigation.

3M further alleges that Defendants attempted to settle a mass inventory of cases in hopes of burying frivolous claims amongst the more meritorious ones; that Defendants moved to

---

[2] In any event, filing a claim outside the applicable statute of limitations is not fraud; the statute of limitations is an affirmative defense that must be raised, and may be waived, by a defendant. *See*, *e.g.*, *Hieneman v. Wooten*, 21-1081, 2024 WL 648704 at *3 (Ky. Ct. App. Feb. 16, 2024) (citing *Bowling v. Ky. Dep't of Corr.*, 301 S.W.3d 478, 485) (Ky. 2009), *as corrected* (Jan. 4 2010)) ("Appellees failed to assert the affirmative defense of the statute of limitations and thus waived it.").

voluntarily dismiss several fraudulent claims after 3M suspected foul play and thereby obviate the need for depositions and written discovery which would only further expose the fraud; that Defendants submitted false affidavits to the Court in an attempt to overcome a statute of limitations defense; and when all else failed, Defendants Givens and Martin filed motions to withdraw as counsel in an attempt to distance themselves from Hammond and the so-called "Enterprise." (R. Doc. 40 at pp. 56–99.) However, as detailed below, 3M fails to state a claim against Givens upon which relief can be granted, and the instant lawsuit must be dismissed.

### III.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a plaintiff's complaint and provides that a complaint must be dismissed if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss filed under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When faced with a motion to dismiss, the court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Mich.*, 138 F.4th 457, 463 (6th Cir. 2025);citing *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020). The Court, however, "need not accept as true legal conclusions or unwarranted factual inference." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000).

### IV.    Law and Argument

#### A. The *Noerr-Pennington* doctrine immunizes Givens from liability and bars this lawsuit in its entirety.

The *Noerr-Pennington* doctrine shields private actors from liability arising out of petitioning the government, including the courts, to take action. Here, because the crux of 3M's

claims against Defendant Givens relates solely to allegedly bogus lawsuits he and his co-Defendants filed on behalf of various plaintiffs, the *Noerr-Pennington* doctrine bars 3M's lawsuit.

> Under the Petition Clause of the First Amendment to the U.S. Constitution, private actors have the right to petition the government for action… Where private actors petition the government for action that would violate [civil legislation], the Petition Clause immunizes the actors from litigation in connection with their petitioning. [This]… is known as the *Noerr-Pennington* doctrine.

*VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683–84 (6th Cir. 2012); citing *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

> The doctrine—which initially appeared in the field of antitrust—recognizes that statutes should not be construed to cover the activity of petitioning the government, if at all possible. Whether the branch of government is the legislature, the executive, or the courts, the right to present one's viewpoint is protected by the First Amendment.

*Domanus v. Locke Lord LLP*, 847 F.3d 469, 483 (7th Cir. 2017). The *Noerr-Pennington* doctrine was originally "viewed as a protection of the right to petition from the seemingly conflicting provisions of the Sherman Act." *Wilder v. Hall*, 501 F.Supp.2d 887, 895 (E.D. Ky. 2007); citing *Noerr*, 365 U.S. at 138; *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992). The policy considerations behind protection of petitioning activity are aimed at avoiding "a chilling effect on the exercise of this fundamental First Amendment right." *Or. Natural Res. Council v. Mohla,* 944 F.2d 531, 533 (9th Cir. 1991) (quoting *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board*, 542 F.2d 1076, 1082 (9th Cir. 1976)).

"The doctrine has since grown into a broader protection of First Amendment rights." *Wilder*, 501 F.Supp.2d at 895.; (citing *Video Int'l Prod., Inc. v. Warner–Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (applying *Noerr-Pennington* to section 1983 claim); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614–15 (8th Cir.

1980) (applying *Noerr-Pennington* in the zoning context)). Indeed, federal courts have routinely applied the *Noerr-Pennington* doctrine to immunize private persons from civil liability under RICO where the underlying activities giving rise to the RICO claim involved petitioning the courts for redress. *See*, *e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) (defendant, a satellite television provider, was entitled to *Noerr-Pennington* immunity where consumer-plaintiffs filed class action lawsuit alleging RICO violations the defendant, who sent prelitigation demand letters arising out of alleged signal theft); *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) ("Noerr Pennington immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Int'l Bhd. Of Teamsters, Local 734 Health and Welfare Trust Fund v. Phillip Morris, Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (applying *Noerr-Pennington* to RICO claims brought by health insurers and welfare benefit funds arising out of alleged misstatements designed to influence Congress to pass legislation regarding the relationship between smoking and health); *Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F.Supp.2d 732 (N.D. Ill. 2012) (applying *Noerr-Pennington* immunity to claims sounding in antitrust and RICO); *Marina Pt. Dev. Assocs. v. United States*, 364 F.Supp.2d 1144 (S.D. Ca. 2005) (immunizing defendants from plaintiff's RICO claims); *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 11-6239, 2013 WL 2444036 at *6 (D. N.J. June 4, 2013) ("the Court holds that the Noerr-Pennington doctrine bars Plaintiffs' RICO claims arising out of Defendants' prosecution of the Ocean County Superior Court foreclosure action."). Similarly, the doctrine has been applied to state law claims. *See Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (citations omitted) ("Although the *Noerr-Pennington* doctrine was initially recognized in the antitrust field, federal courts have by analogy applied it to claims brought under both state and federal law, including common law claims of tortious interference.")

Importantly, the fact "[t]hat a private party's political motives are selfish is irrelevant: '*Noerr* shields from [RICO liability] a concerted effort to influence public officials regardless of intent or purpose.'" *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344 (1991) (quoting *Pennington*, 381 U.S. at 670, 85 S.Ct. at 1593); *see also VIBO Corp.*, 669 F.3d at 684 (citing *Campbell*, 509 F.3d at 790) ("the bad intent or anticompetitive motivation of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*."). If one's representations to the courts or to other private actors are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust [or RICO] litigation but more speech—the marketplace of ideas." *Schachar v. Am. Acad. Of Opthamology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989).

When faced with a defense of *Noerr-Pennington* immunity, courts utilize the following analysis. First, they must

> determine whether [plaintiff's] lawsuit burdens [defendant's] petitioning activities. If it does, [the court] must examine the precise petitioning conduct [defendant] engaged in to determine whether the burden identified may be imposed consistently with the Constitution. If there is a substantial question that it may not, [the court] must determine whether RICO or the RICO predicate acts [plaintiff] alleges clearly provide for liability for the conduct at issue. If a reasonable construction of RICO or the predicate act statutes exists that avoids the burden, we will adopt that construction. Only where statutes clearly provide for the burden posed by the lawsuit will we address whether the statute may be applied to the petitioning conduct consistently with the Constitution.

*Sosa*, 437 F.3d at 932. In *Sosa*, the Ninth Circuit found that imposing RICO liability on DIRECTV, a satellite television broadcaster, for its actions in sending pre-litigation settlement demand letters to the plaintiffs, a group of consumers who allegedly stole satellite signals from the defendant, would "quite plainly burden DIRECTV's ability to settle legal claims short of filing a lawsuit… Accordingly, Sosa's RICO suit poses a burden on DIRECTV's communication of the demand letters almost identical to that posed by the Sherman Act claims on the petitioning conduct at issue

in *Noerr* and its progeny." *Id.* at 933. Next, the court considered whether imposing such burdens

on sending demand letters runs afoul of the Petition Clause. *Id.* Inherent in this inquiry is the

question of "whether the demand letters constitute either protected petitioning activity or activity

which must be protected to afford breathing space to the right of petition guaranteed by the First

Amendment." *Id.*

Central to the concept of "breathing space" is the notion that certain activity, which may

not in itself be considered petitioning the government, is so incidental to the act of petitioning the

government that it too must be afforded immunity under the doctrine. For example,

"communications to the court[,]" including the filing of a complaint, answer, pleadings and motion

practice, are fairly characterized as "petitioning." On the other hand, the demand letters at issue in

Sosa were not communications directed to the court, but rather to private parties prior to the

inception of any litigation. *Id.*

> This conclusion is not the end of the inquiry, however. Although the letters were
> not themselves petitions, the Petition Clause may nevertheless preclude burdening
> them so as to preserve the breathing space required for the effective exercise of the
> rights it protects. The notion of First Amendment breathing space derives from
> cases in the Freedom of Speech arena. In *New York Times Co. v. Sullivan,* 376 U.S.
> 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that, to
> adequately safeguard the freedom of speech, a defamation plaintiff who is a public
> official must prove not only falsehood but also actual malice, thereby providing
> protection to some false statements. *Id.* at 279–80, 84 S.Ct. 710. "Although the
> erroneous statement of fact is not worthy of constitutional protection, ... [t]he First
> Amendment requires that we protect some falsehood in order to protect speech that
> matters." *Gertz,* 418 U.S. at 340–41, 94 S.Ct. 2997. The protection is necessary "to
> assure to the freedoms of speech and press that 'breathing space' essential to their
> fruitful exercise." *Id.* at 342, 94 S.Ct. 2997.

*Id.*

Therefore, under the "breathing space" principle, jurisprudence has developed to extend

First Amendment protection to two types of activities which, on their face, are not encompassed

by the free speech clause of the Constitution. *Id.* "First, certain classes of speech not meriting protection in themselves—the false statements in *New York Times*, for example—must nevertheless be protected in order to fully vindicate the free speech rights guaranteed by the First Amendment." *Id.*; citing *New York Times,* 376 U.S. at 279-80, 285, 84 S.Ct. 710. "The second aspect of the breathing space principle was recognized in *Noerr* itself, where the Court extended immunity not only to the railroads' direct communications with legislators but also to its public relations campaign, finding that the latter's aim was to influence the passage of favorable legislation." *Id.* at 934; citing *Noerr*, 365 U.S. at 140–43, 81 S.Ct. 523. Under the breathing space principle, "in the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine." *Id.* at 934-35;  (quoting *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528–29 (9th Cir. 1991), *aff'd*, 508 U.S. 49, 113 S.Ct. 1920 (1993)). Accordingly, the *Sosa* court found the defendant's activity immune from suit.

Applying the above principles to the instant matter, the conduct that Defendant Givens is accused of is clearly immunized from liability under the *Noerr-Pennington* doctrine because it all involves litigation activity. Under the first step of the analysis, the Court must ask whether 3M's lawsuit burdens Defendants' litigation activities. *Sosa*, 437 F.3d at 932. There is no doubt that the lawsuit, which is admittedly about 3M "vindicating its rights for having to defend itself against false and fraudulent lawsuits that Defendants—three attorneys from three different law firms in three different states—filed and prosecuted against 3M knowing them to be without merit[,]" (R. Doc. 40 at p. 1 ¶2) burdens Defendant Givens' right to petition the courts for redress on behalf of his clients.

Because 3M's lawsuit burdens Givens' petitioning activities, the next step in the analysis requires examination of "the precise petitioning conduct [Defendant Givens] engaged in to determine whether the burden identified may be imposed consistently with the Constitution." *Sosa*, 437 F.3d at 932. Here, each act which Givens is accused of involves either directly petitioning the Court through motion practice or conduct incidental to litigation, i.e., communications with his clients and counsel for 3M, and thus must be afforded breathing space. The burdens imposed by 3M's lawsuit on Givens' conduct cannot be imposed consistently with the Constitution because any attempt to hinder Givens' actions would be to stifle his rights under the Petition Clause of the First Amendment. *See Sosa*, 437 F.3d at 931 ("we conclude that the *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause… Under the *Noerr-Pennington* rule of statutory construction, we must construe federal statutes so as to avoid burdening conduct that implicates the protects afforded by the Petition Clause unless the statute clearly provides otherwise.").

Specifically, the filing of documents into the court's docket is clearly petitioning activity protected by the *Noerr-Pennington* doctrine. The other ancillary conduct 3M has accused Givens of committing, including the use of mail and wires to communicate with his clients and with 3M as well as alleged misconduct in the discovery process, is subject to the breathing space which must be afforded by the doctrine "for the effective exercise of the rights it protects." *Id.* at 933; *see also*, *Kearney v. Foley & Larnder, LLP*, 590 F.3d 638, 646 (9th Cir. 2009) (citation omitted) ("discovery is incidental to litigation and comes within the *Noerr-Pennington* doctrine if the underlying litigation is protected by the Petition Clause."). Indeed, the immunity afforded by the doctrine would be without teeth if petitioning activity directly to the court were protected, but

13

communications between the attorney and client and between opposing counsel, both necessary and fundamental aspects of litigation, were not. There can be no "substantial question" that the burdens imposed by 3M's lawsuit cannot be imposed consistently with the Constitution. *Sosa*, 437 F.3d at 932. Accordingly, *Noerr-Pennington* immunity applies and shields Defendant Givens from liability as alleged in this lawsuit, and the claims against Givens must be dismissed with prejudice.

### B. Federal RICO claims

3M has asserted a civil RICO claim in violation of 18 U.S.C. § 1962(c) and a civil RICO conspiracy claim in violation of 18 U.S.C. § 1962(d) against Givens and his co-defendants. 3M has failed to allege cognizable predicate acts, an essential element of RICO and RICO conspiracy claims. Accordingly, Givens is entitled to dismissal of these claims.

Civil RICO claims have "an almost inevitable stigmatizing effect on those named as defendants." *Curtis & Assoc. v. Bushman*, 758 F.Supp.2d 153, 156 (E.D.N.Y. 2010) (citation omitted). "Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Gutterman v. Herzog*, No. 10-1081, 2020 WL 6728787 at *3 (E.D.N.Y. Nov. 16, 2020) (citation omitted).

Under 18 U.S.C. § 1962(c), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The requirements to violate this statute are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275 (1985)). Each element must be alleged by the plaintiff for a claim to be properly stated. *Heinrich*, 668 F.3d at 404.

14

### i.   The "Conduct"

To satisfy the "conduct" element, a plaintiff must allege that the defendant "participated in the 'operation or management' of the enterprise." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012); quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163 (1993). "RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only 'some part' in directing the enterprise's affairs is required. However, defendants must have 'conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.'" *Id.* (quoting *Reves*, 507 U.S. at 179, 185). To satisfy the "operation or management" test, the Sixth Circuit has held "that it can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *Id.* (quoting *United States v. Fowler*, 535 F.4d 408, 418 (6th Cir. 2008)) (emphasis added in *Ouwinga*).

### ii.   The "Enterprise"

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In this case, 3M alleges that Givens and his co-defendants have created an association-in-fact enterprise. (R. Doc. 40 at 107, ⁋ 207.) An association-in-fact enterprise is defined as "a group of persons associated together for a common purpose of engaging in a course of conduct [which] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2454 (1981). Under RICO, this type of enterprise has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237 (2009). Moreover, "[t]he facts must demonstrate

all the participants acted with the same purpose in mind pursuant to a unified agenda." *Marshall v. Goguen*, 604 F.Supp.3d 980, 1012 (D. Mont. 2022) (citations omitted). Parties that enter commercial relationships "for their own gain or benefit" do not constitute an "enterprise." *City of Cleveland v. Woodhill Supply, Inc.*, 403 F.Supp.2d 631, 635 (N.D. Ohio 2004) (citation omitted); *see also Javitch v. Capwill*, 284 F.Supp.2d 848, 857 (N.D. Ohio 2003) (holding that a business relationship, even one that perpetuates a fraud, is insufficient to plead a RICO enterprise).

### iii. The "pattern"

A "pattern" of racketeering activity "requires at least two acts of racketeering activity" that occur within ten years of one another. 18 U.S.C. § 1961(5). "Section 1961(5) concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893 (1989). Accordingly, "[i]t is not the number of predicates but the relationship that they bear to each other or to some external organizing principle" that matters. *Id.*

To satisfy the pattern requirement, 3M must show "(1) a relationship between the predicate acts and (2) the threat of continued activity." *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 229 (6th Cir. 1997); citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901 (1989). With regard to the relationship requirement, under Sixth Circuit jurisprudence, the predicate acts alleged must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events." *Vild v. Visconsi*, 956 F.2d 560, 566 (6th Cir. 1992), *cert. denied*, 506 U.S. 832, 113 S.Ct. 99 (1992).

When evaluating the continuity requirement, the Sixth Circuit has articulated the following factors for consideration:

> [T]he length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); the number of victims (the more the better); and the number of perpetrators (the less the better).

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995), *cert. denied*, 516 U.S. 1158, 116 S.Ct. 1041 (1996); *see also Aces High Coal Sales, Inc. v. Comm. Bank & Trust of W. Ga.*, 768 Fed. App'x 446, 454 (6th Cir. 2019) (holding that the tests set forth in *Vild* and *Columbia* should be read in tandem and not disjointedly). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Aces*, 768 Fed. App'x at 455 (quoting *H.J. Inc.*, 492 U.S. at 241).

### iv. The "Racketeering Activity"

The "racketeering activity" that is a predicate act for a civil RICO claim consists of acts which are indictable under various federal statutes, and which are enumerated in 18 U.S.C. § 1961(1)(B). Mail fraud and wire fraud are listed predicate offenses that can constitute racketeering activity. *See*, *e.g.*, *In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 484 (6th Cir. 2013);citing 18 U.S.C. § 1961(1). "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131 (2008); quoting *Schmuck v. United States*, 498 U.S. 705, 712, 109 S. Ct. 1443 (1989). Moreover, "where multiple defendants are accused of mail or wire fraud, plaintiffs must plead with particularity as to each defendant ..." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F.Supp.2d 432, 443–44 (S.D.N.Y. 2004) (citations

omitted). Where the plaintiff alleges wire fraud as a predicate act, the heightened pleading standard of Rule 9(b) applies. *See Curtis & Assoc.*, 758 F. Supp. 2d at 167. "Allegations based on 'information and belief,' without more, will not suffice. Nor may the plaintiffs 'rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud.'" *Gutterman*, 2020 WL 6728787 at *3; quoting *Holmes v. Allstate*, 2012 WL 627238 at *23 (S.D.N.Y. Jan. 27, 2012) (citing *Trustees of Plumbers*, 896 F.Supp 342, 347 (S.D.N.Y. 1995)).

Here, 3M alleges that Givens and his co-defendants engaged in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. Additionally, 3M specifically alleges that Hammond, though not Givens or Martin, engaged in obstruction of justice and concealment of evidence in violation of 18 U.S.C. §§ 1503 and 1512(c). However, as explained below, 3M has failed to state a cognizable RICO claim against Defendant Givens because it has failed to allege an actionable predicate act that would support such claims.

### C. 3M cannot impute the alleged predicate acts of obstruction of justice and concealment of evidence committed by Hammond to Givens.

In addition to the allegations that all Defendants committed wire fraud and mail fraud, 3M also specifically alleges that Defendant Hammond engaged in obstruction of justice and concealment of evidence in violation of 18 U.S.C. §§ 1503 and 1512(c). However, Defendant Hammond's bad acts cannot be imputed to Defendant Givens because by 3M's own representations to this Court, Defendant Hammond acted independently of any alleged "enterprise" and did not inform Defendant Givens of his intention to hide documents. (*See* R. Doc. 11 at pp. 2–3) Specifically, 3M claims that Hammond hid banker boxes full of 3M litigation files in a storage unit, and that he did so to protect his own self-interest and conceal his knowing and intentional pursuit of baseless claims. (*See* R. Doc. 11.) As noted above, 3M has alleged that *no*

*one* except for two of Hammond's employees knew that Hammond moved these case files, and that Hammond intended for their existence to be kept secret, including from Defendant Givens. When Givens learned of Hammond's actions and requested to view these files, Hammond refused. (R. Doc. 11 at p. 4.) Such activity committed by Hammond alone cannot constitute a predicate act attributable to Defendant Givens, where there has been no suggestion that Givens had any knowledge or consented to the concealment of such documents.

At best, 3M has alleged that with respect to the concealment of evidence and obstruction of justice allegations against Defendant Hammond, Hammond acted alone to cover up his own alleged judicial misconduct. This fails to satisfy the common purpose or unified agenda necessary to establish an association-in-fact enterprise. *See Marshall*, 604 F.Supp.3d at 1012. Even assuming that Givens knowingly sought to benefit financially from Hammond's misconduct (which is denied), this alone would be insufficient to establish that they acted with a unified agenda regarding Hammond's concealment of documents.

For example, in *Marshall v. Goguen*, the plaintiffs alleged that one defendant, Goguen, engaged in sexual misconduct, then attempted to conceal his misconduct, while his co-defendants "associated together to engage in a course of conduct for the purpose of protecting and preserving Goguen's reputation, facilitating his sexual encounters and/or criminal misconduct, while profiting from their association with Goguen and his business entities." *Marshall*, 604 F.Supp.3d at 1012–13 (internal quotations omitted). The defendants responded that the plaintiffs alleged three distinct purposes: "(1) to prevent harm to Goguen's reputation, (2) to cover up Goguen's conduct, and (3) to profit from association with Goguen—and that not *all* participants acted with the *same* purpose, foreclosing a unified agenda" necessary to establish an association-in-fact enterprise. *Id.* at 1013 (emphasis original). The district court agreed with the defendants, finding

[t]hat argument has merit, because even accepting Plaintiffs' allegations as true, Goguen sought to preserve his reputation, while the non-Goguen Defendants sought to financially benefit off him[.] This being so, the financial interest of the other Defendants falls short of a common purpose as "parties that enter commercial relationships for their own gain or benefit do not constitute an enterprise."

*Id.*; citing *In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litigation*, 11-7166, 2012 WL 10731957 (C.D. Cali. June 29, 2012).

Here, by 3M's own representations to this Court, in secreting the allegedly fraudulent documents, Hammond acted individually and without the knowledge, participation, or consent of Givens to conceal the evidence from being discovered. Under these circumstances, it cannot be said that these supposed predicate acts support the finding of an association-in-fact enterprise because Hammond acted alone, not with Givens or Martin, and thus Defendants did not act with a unified agenda. Assuming these allegations are true regarding the concealment of evidence by Hammond, Givens cannot be held liable for these acts. 3M's allegation that Hammond's actions "were intended to prevent the exposure of, and were therefore related to, Defendants' violation of the mail and wire fraud statutes" is factually and legally erroneous. (R. Doc. 40 at p. 109, ¶ 215.) *See Marshall*, 604 F. Supp. 3d at 1012–13.

### D. 3M fails to state a claim against Givens because "litigation acts" do not constitute predicate acts under civil RICO and RICO conspiracy claims.

In the absence of obstruction of justice claims that can be imputed to the enterprise or to Defendant Givens individually, the only remaining predicate acts that 3M has alleged that may apply to Givens are wire fraud and mail fraud. (R. Doc. 40 at pp. 103–104.) The acts committed by Givens and by the alleged enterprise that 3M contends constitute mail fraud and wire fraud all relate to electronic communications and mailings relative to the various ongoing lawsuits against 3M. (R. Doc. 40 at pp. 103–104.)  Specifically, 3M alleges that Givens and his co-defendants repeatedly violated Sections 1341 and 1343 in a series of related acts "because the illegal mailing

and wirings all pertained to the fabrication, filing, and concealing of the phony product liability claims at the center of Defendants' scheme." (R. Doc. 40 at p. 109 ⁋ 214.) However, as discussed below, these activities, even if true, are litigation acts which cannot serve as predicate acts under the civil RICO statute.

### i. Federal jurisprudence precludes the finding that litigation acts may constitute wire fraud under RICO.

A long line of federal cases holds that "litigation acts" and the transmission of litigation documents—without more—cannot serve as predicate acts of mail fraud and wire fraud to underpin a federal RICO action. *See*, *e.g.*, *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) ("[We] conclude that the allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act."); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016); quoting *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002) ("In the absence of corruption,[3] we agree with our sister circuit that 'prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system. Moreover, allowing such charges would arguably turn many state-law actions for malicious prosecutions into federal RICO actions."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086 (11th Cir. 2004) (*per curiam*) (holding that mail fraud, extortion, and malicious prosecution, all arising out of an alleged conspiracy to extort money from the plaintiff through the filing of malicious lawsuits, cannot serve as predicate acts for a civil RICO claim); *Nolan v. Galaxy Scientific Corp.*, 269 F.Supp.2d 635, 643 (E.D. Pa. 2003) ("[The plaintiff] asks this court to decide that the mailing of letters denying liability and the filing of litigation documents known to contain

---

[3] Expanding upon the notion that bad faith litigation in the absence of "corruption" cannot sustain a civil-RICO claim, under Fifth Circuit jurisprudence, this simply means that "civil-RICO liability should not exist unless the pleadings allege actual criminal activity." *Snow Ingredients, Inc.*, 833 F.3d at 525 (citing *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009)).

falsehoods constitute predicate acts under RICO… This court is unwilling to expand RICO liability for mail fraud in such a dramatic fashion as to include litigation papers and pre-litigation statements of legal position."); *Daddona v. Gaudio*, 156 F.Supp.2d 153, 162 (D. Conn. 2000) (citations omitted) ("Attempts to characterize abuse of process or malicious prosecution claims as mail and wire fraud violations for RICO purposes have been scrutinized by the courts, and have been rejected where the only allegedly fraudulent conduct related to the filing of documents in litigation.:); *Paul S. Mullin & Assocs., Inc v. Bassett*, 632 F.Supp.532, 540 (D. Del. 1986) ("The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud."); *UMB Bank, N.A. v. Benton*, No. 21-832, 2022 WL 16753765 at *8 (W.D. Mo., June 29, 2022) (citations omitted) ("The Court finds that regardless of whether Missouri's litigation privilege applies, there is a robust consensus among federal courts that 'serving litigation documents by mail or wire cannot constitute fraud' for purposes of establishing a RICO predicate act."); *Nakahara v. Bal*, No. 97-2027, 1998 WL 35123 (S.D.N.Y. Jan. 30, 1998) (rejecting the argument that the defendants, who conspired in a scheme to deprive plaintiffs of money and property by knowingly making perjurious statements in various court filings, committed wire fraud and mail fraud under RICO, and finding that the gravamen of the complaint related to malicious prosecution).

The policy reasons behind this are sound: to allow the contrary "would have sweeping consequences indeed, potentially permitting any litigant to allege that the opposing party's submissions to the court denying allegations were false and therefore constituted mail fraud." *Nolan*, 269 F.Supp.2d at 643. If the court permitted the filing of litigation documents to constitute wire fraud in a civil RICO action, "every unsuccessful lawsuit would spawn a retaliatory action, which would inundate the federal courts with procedurally complex RICO pleadings, engender

wasteful satellite litigation, and spawn ad infinitum litigation with each party claiming that the opponent's previous action was malicious and meritless." *UMB Bank*, 2022 WL 16753765 at *8 (quoting *Kim*, 888 F.3d at 104) (internal quotation marks omitted). The United States Court of Appeals for the Fifth Circuit has joined the Eleventh Circuit in finding that "prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system. Moreover, allowing such charges would arguably turn many state-law actions for malicious prosecutions into federal RICO actions." *Snow Ingredients, Inc.*, 833 F.3d at 525;quoting *Pendergraft*, 297 F.3d at 1208 (internal quotation marks omitted).

### ii. Every "fraudulent" act allegedly committed by Givens that 3M argues constitutes mail and/or wire fraud is a "litigation act" that cannot serve as a predicate act under RICO.

Here, the specific acts that 3M alleges Defendant Givens engaged in, which it contends constitute mail fraud and wire fraud include filing and prosecuting over 850 civil dust mask claims against 3M; communicating with clients, the courts, and counsel for 3M through the use of mail and wires; filing various pleadings and affixing his name to a signature block alongside Defendants Hammond and Martin; and engaging in written discovery and defending clients' depositions.[4] (*See generally*, R. Doc. 40.): Each act that 3M alleges Defendant Givens committed in furtherance of the scheme to defraud 3M and in connection with the alleged association-in-fact Enterprise directly relates to the dust mask litigation against 3M. Distilled to their most basic factual nature, each allegation against Givens involves alleged misstatements to the Court or to 3M that were made through the use of mail or wires (i.e., letters, emails, and electronic filings) and lawyer-client communications, including advice on how to prepare for depositions and respond to written discovery.

---

[4] Defendant Givens exhaustively sets forth the allegations 3M raised in its complaint in the Factual Background section, infra pp. 5–6.

Even assuming each factual allegation in 3M's complaint is true (which is denied), none of the factual allegations raised therein can constitute the predicate acts of mail or wire fraud to give rise to a civil RICO claim because they are all "litigation acts" as defined by applicable jurisprudence. *See, e.g.*, *Snow Ingredients, Inc.*, 833 F.3d at 525 ("In the absence of corruption, [litigation activity] cannot act as a predicate offense for a civil-RICO claim."); *Raney*, 370 F.3d 1086 (holding that allegations of mail fraud, extortion, and malicious prosecution, arising out of an alleged conspiracy to extort money through malicious lawsuits are litigation acts that cannot constitute predicate acts for civil RICO actions); *Paul S. Mullin & Assocs.*, 632 F. Supp. At 540 (finding "absurd" the argument that a lawyer sending a letter stating a client's legal position can constitute mail fraud); *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., L.L.C.*, 202 F. Supp. 2d 1339, 1351 (S.D. Fla. 2002) (filing falsified affidavits in an ongoing litigation which conceal material facts is "legally insufficient" to establish predicate acts in civil RICO claim because it is properly categorized as litigation conduct); *Gunn v. Palmieri*, No. 98-1418, 1998 WL 119519 at *1 (E.D.N.Y. Sept. 29, 1989) (rejecting plaintiff's attempt to base civil RICO claim on litigation misconduct).

Each act which 3M alleges Givens committed is a litigation act that, if proven to be true, was indisputably committed in the course of ongoing litigation against 3M. 3M admits this in its Complaint; the gravamen of its Complaint relates to supposed misconduct Givens and his co-defendants committed throughout the course of various litigation proceedings against 3M. At the pleadings stage, this Court is bound to accept the well-pleaded allegations in the complaint as true. And, applying this standard, it is clear that 3M has failed to allege viable predicate acts of wire fraud and mail fraud against Defendant Givens because litigation acts and the transmission of

litigation documents through the use of mail and wires are not predicate offenses which can give rise to civil RICO liability.

>   iii.   **Because 3M has failed to allege a viable civil RICO claim, its civil RICO conspiracy claim must also fail.**

Moreover, because 3M has failed to state a civil RICO claim against Defendant Givens under 18 U.S.C. § 1962(c), 3M's civil RICO conspiracy claim must also fail under 18 U.S.C. § 1962(d). *Grubbs v. Sheakley Grp.*, Inc. 807 F.3d 785, 806 (6th Cir. 2015) ("Plaintiffs' RICO conspiracy claim fails because Plaintiffs failed to allege a substantive RICO violation in the first place."); *Heinrich*, 668 F.3d at 411;quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983) ("To plausibly state a claim for a violation of 18 U.S.C. § 1962(d), plaintiffs must successfully allege all the elements of a RICO violation, as well as alleging 'the existence of an illicit agreement to violate the substantive RICO provision.'"); *Aces*, 768 Fed. App'x at 459 ("Because plaintiffs failed to plausibly allege a violation of 18 U.S.C. § 1962(b) or (c), the district court properly dismissed the RICO conspiracy claim as well."). Accordingly, Givens is entitled to dismissal with prejudice of Counts I (civil RICO) and II (civil RICO conspiracy) claims against him.

>   **E.  3M has failed to state a claim upon which relief can be granted under Kentucky common law and Defendant Givens is entitled to dismissal of the state law claims against him.**

As discussed above, the *Noerr-Pennington* doctrine applies to state law claims. *See*, *e.g.*, *Campbell*, 509 F.3d at 790 (citations omitted). Accordingly, because the state law claims arise out of the same operative facts as the federal RICO claims, 3M's lawsuit should be dismissed with prejudice in its entirety. However, if the Court  addresses the merits of 3M's common law claims, it should nevertheless dismiss the claims with prejudice because 3M has failed to state claims of fraud and civil conspiracy under the common law of Kentucky on which relief can be granted.

### i. 3M fails to state a claim for fraud under Kentucky common law.

3M's common law fraud claim against Defendants is rooted in the "material misrepresentations [made] to 3M in the Enterprise Complaints." (R. Doc. 40 at p. 110, ⁋220.) Specifically, 3M contends that Defendants' material misrepresentations centered around the applicable statute of limitations and whether, or to what extent, a particular plaintiff may have used a 3M dust mask, and that Defendants intended for 3M to rely on these falsities. (R. Doc. 40 at pp. 110–112, ⁋⁋ 220–225.) However, 3M's common law claim against Defendants, which is solely rooted in statements allegedly made during the course of litigation, is precluded by Kentucky's longstanding judicial statement privilege.

> The judicial statements privilege, described in *Schmitt v. Mann*, 291 Ky. 80, 163 S.W.2d 281, 283 (1942), as the "prevailing rule" in Kentucky and this country, provides that "statements in judicial proceedings are absolutely privileged when material, pertinent, and relevant to the subject matter under inquiry, though it is claimed that they are false and alleged with malice."

*Maggard v. Kinney*, 576 S.W.3d 559, 567 (Ky. 2019). "The judicial statement privilege is one that has been long adhered to in this jurisdiction and is rooted in public policy 'which looks to the free and unfettered administration of justice, though, as an incidental result, it may, in some instances, afford an immunity to the evil-disposed and malignant slanderer.'" *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 184 (Ky. Ct. App. 2014) (quoting *Schmitt*, 291 Ky. 80). The judicial statement privilege is often said to provide immunity from civil suit, however such is not the case.

> As its name implies, it is a privilege and, therefore, precludes the use of those privileged communications to sustain a cause of action. It does not bar the cause of action but only renders it unsustainable if based exclusively on statements privileged under the law. Generally stated, it affords an absolute privilege to statements made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding" and that have "some relation to a proceeding that is contemplated in good faith and under serious consideration." *Rogers v. Luttrell,* 144 S.W.3d 841, 843–44 (Ky.App.2004) (quoting *General Electric Co. v. Sargent & Lundy,* 916 F.2d 1119,

26

1127 (6th Cir.1990)). It applies with equal force to statements in pleadings filed in judicial proceedings. *Massengale v. Lester,* 403 S.W.2d 701–02 (Ky.1966).

*Id.* at 184; *see also Maggard v. Kinney*, 576 S.W.3d 559, 567 (Ky. 2019) (same). The Kentucky Court of Appeals has expanded the judicial statements privilege to encompass claims of fraud. *Id.* at 188-89 ("We also believe the privilege applies to claims of fraud… the judicial statements privilege shields the speaker from claims for fraud in the inducement based on statements made preliminary to, or in the institution of, or during a judicial proceeding if those statements were material, pertinent, and relevant to the judicial proceeding."). Relying on a decision by the Connecticut Supreme Court, the Kentucky appellate court observed that "because the communication of a falsehood is an essential element of both defamation and fraud, the litigation privilege provides a complete defense to both causes of action." *Id.* at 188 (quoting *Simms v. Seaman*, 308 Conn. 523, 548–49 (Conn. 2013) (internal citation omitted)). "[T]he judicial statements privilege covers statements that have already been made in a public manner, such as pleadings and witness testimony, but, like other more common testimonial privileges, its legal significance is to preclude use of those statements in a subsequent legal action in support of a cause of action[.]" *Maggard*, 576 S.W. at 567.

Here, 3M's common law fraud claim against Defendant Givens is based upon material misrepresentations made in the course of litigation. Under longstanding Kentucky jurisprudence, all such misrepresentations, regardless of their falsity and regardless of Givens' intent in making such statements, are subject to the judicial statements privilege. Because there are no other grounds upon which 3M bases its common law fraud claim against Defendants, this claim is precluded by the judicial statements privilege and must be dismissed with prejudice. *See Maggard*, 576 S.W. at 567; *ISCO Indus., Inc. v. O'Neill*, __ S.W.3d __, 2025 WL 2263865 at *3 (Ky. Ct. App. Aug. 8, 2025) (citation omitted) ("In Kentucky, the judicial statement privilege, often referred to as the

litigation privilege in other jurisdictions, provides an absolute privilege from civil suits that arise exclusively out of statements made during judicial proceedings, including pleadings and witness statements[.]"; *Halle*, 453 S.W. at 184. 3M has failed to allege any extrajudicial conduct that would support a common law fraud claim under Kentucky state law. Accordingly, Defendant Givens is entitled to dismissal with prejudice of Count III of the Complaint.

### ii. 3M has not stated a claim for civil conspiracy.

To prove a claim for civil conspiracy under Kentucky law, a plaintiff must prove "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Mosley v. Arch Specialty Ins. Co.*, 626 S.W.3d 579, 594 (Ky. 2021) (citations omitted). "A conspiracy is inherently difficult to prove. Notwithstanding that difficulty, the burden is on the party alleging that a conspiracy exists to establish each and every element of the claim in order to prevail." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002); *see also Mosley*, 626 S.W.3d at 594 ("The burden lies with the plaintiff to prove every element of conspiracy."). Relative to the "concert of action" element of a civil conspiracy claim, Kentucky courts have looked to the Restatement (Second) of Torts, Section 876, which states:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*James*, 95 S.W.3d at 897; quoting *Farmer v. City of Newport*, 748 S.W.2d 162, 164 (Ky. App. 1988) (citing the Restatement (Second) of Torts). "Clearly, the law in Kentucky requires the actual commission of the tortious act or a concert of action where substantial assistance has been provided

in order for liability to attached based on a civil conspiracy theory." *Id.* at 897–98. Here, because Count III for common law fraud fails, so too must Count IV for civil conspiracy under Kentucky common law. Accordingly, this claim must be dismissed with prejudice.

## V.    Conclusion

Instead of defending claims on their merits, 3M has attempted to subvert the legal process by weaponizing the federal civil RICO statute against Defendant Givens in a way that has never been endorsed by federal courts. However, this entire lawsuit is barred by the *Noerr-Pennington* doctrine. In addition, even if the Court reaches the merits of 3M's claims, separate, independent bases exist which justify dismissal of this lawsuit. Despite 3M's improper attempt to characterize Givens' litigation acts as mail fraud and wire fraud under RICO, the law does not allow such claim to lie. Similarly, 3M has failed to state a claim under Kentucky common law because it has not alleged any fraudulent conduct committed by Givens outside the litigation context. Even assuming every allegation 3M has raised in its First Amended Complaint is true, it has failed to state a claim upon which relief can be granted, and Givens is entitled to dismissal of all counts against him.

Wherefore, for the reasons set forth above, Defendant, John "Johnny" Givens, respectfully requests that this Court grant his Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) and dismiss all counts against him in the First Amended Complaint with prejudice.

Respectfully submitted this the _____ day of _____, 2025.


**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

**GAINSBURGH, BENJAMIN, DAVID,**
**MEUNIER & WARSHAUER, L.L.C.**

BY: */s/ Walter C. Morrison, IV*

    Walter C. Morrison, IV (*Pro Hac Vice*)
    240 Trace Colony Park Drive, Suite 100
    Ridgeland, Mississippi 39157
    Telephone:  (601) 933-2054
    Facsimile: (504) 528-9973
    E-mail:  wmorrison@gainsben.com

    Brittany R. Wolf-Freedman (*Pro Hac Vice*)
    601 Poydras Street, Suite 2355
    New Orleans, Louisiana 70130
    Telephone: (504) 522-2304
    Facsimile: (504) 528-9973
    E-mail: bwolf@gainsben.com

    And

    */s/ Judd R. Uhl*
    **Judd R. Uhl (KY Bar No. 89578)**
    **Lewis Brisbois Bisgaard & Smith LLP**
    3499 Blazer Parkway, Suite 330
    Lexington, KY 40509
    Telephone: (513) 808-9913
    Facsimile: (513) 808-9912
    Email: judd.uhl@lewisbrisbois.com

    *Attorneys for Defendant, John Givens*

## CERTIFICATE OF SERVICE

I, Walter C. Morrison, IV, hereby certify that on October 3, 2025, I electronically filed the foregoing with the Clerk of Court by using the Court's electronic filing system which will send a notice of electronic filing to all counsel of record.

    */s/ Walter C. Morrison, IV*

30