## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **3M COMPANY**, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 7:25-cv-00037-REW-MAS |
| **GLENN HAMMOND, MICHAEL B. MARTIN, and JOHN (a.k.a. "JOHNNY") GIVENS**, | ) ) ) ) | |
| Defendants. | ) ) | |

## 3M COMPANY'S CONSOLIDATED OPPOSITION TO
## <u>DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

OVERVIEW OF THE FIRST AMENDED COMPLAINT .......................................................... 2

LEGAL STANDARD ............................................................................................................ 4

ARGUMENT ...................................................................................................................... 5

    I.    Count One plausibly alleges Defendants violated RICO........................................ 5

        A.    Count One plausibly alleges an association-in-fact enterprise. ................. 6

        B.    Count One plausibly alleges racketeering activity...................................... 8

        C.    Count One plausibly alleges a pattern of racketeering. ............................ 11

        D.    Count One plausibly alleges cognizable RICO injury. ............................. 12

    II.    Count Two plausibly alleges a RICO conspiracy. ................................................. 14

    III.    Count Three plausibly alleges fraud under Kentucky law..................................... 15

    IV.    Count Four plausibly alleges civil conspiracy under Kentucky law..................... 19

    V.    Defendants fail to establish a *Noerr-Pennington* defense.................................... 20

        A.    The sham exception applies to 3M's claims. ............................................ 20

        B.    By its own terms, *Noerr-Pennington* does not apply to the non-petitioning activity alleged in the Complaint............................................ 27

    VI.    *Younger* abstention does not apply to 3M's claims. ............................................ 29

CONCLUSION .................................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. O'Connor*,
914 F.3d 1010 (6th Cir. 2019) .................................................................30

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
2024 WL 5166648 (M.D. Tenn. Apr. 29, 2024)......................................26

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)................................................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................4

*Blackwell v. Nocerini*,
123 F.4th 479 (6th Cir. 2024) .................................................................25

*Blue Cross & Blue Shield of Mich. v. Kamin*,
876 F.2d 543 (6th Cir. 1989) ..................................................................12

*Boyle v. United States*,
556 U.S. 938 (2009)...........................................................................5, 6, 7

*Brown v. Cassens Transp. Co.*,
546 F.3d 347 (6th Cir. 2008) ..................................................................12

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000)..............................................25, 26

*Carroll v. City of Mount Clemens*,
139 F.3d 1072 (6th Cir. 1998) ................................................................31

*Carroll v. U.S. Equities Corp.*,
2020 WL 11563716 (N.D.N.Y. Nov. 30, 2020) ......................................11

*Cement-Lock v. Gas Tech. Inst.*,
2005 WL 2420374 (N.D. Ill. Sept. 30, 2005) .........................................13

*Ceres Protein, LLC v. Thompson Mech. & Design*,
2016 WL 6090966 (W.D. Ky. Oct. 18, 2016) .........................................23

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991)........................................................................20, 21

*CSMN Invs., LLC v. Cordillera Metro. Dist.*,
    956 F.3d 1276 (10th Cir. 2020) ...................................................27

*CSX Transp., Inc. v. Gilkison*,
    2012 WL 1598081 (N.D.W. Va. May 3, 2012) ..........................11

*Deck v. Engineered Laminates*,
    349 F.3d 1253 (10th Cir. 2003) ...................................................10

*Eidson v. State of Tenn. Dep't of Children's Servs.*,
    510 F.3d 631 (6th Cir. 2007) .......................................................30

*El-Hallani v. Huntington Nat'l Bank*,
    623 F. App'x 730 (6th Cir. 2015) .................................................4

*In re Emoral Inc.*,
    740 F. 3d 875 (3d Cir. 2014)........................................................30

*EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*,
    2022 WL 992948 (E.D. Mich. Mar. 31, 2022) ..........................26

*Gabovitch v. Shear*,
    70 F.3d 1252 (1st Cir. 1995)........................................................10

*Gargiulo v. Baystate Health, Inc.*,
    826 F. Supp. 2d 323 (D. Mass. 2011) .........................................18

*Graham Packaging Co., L.P. v. Ring Container Techs., LLC*,
    2025 WL 978220 (W.D. Ky. Mar. 31, 2025) .................23, 24, 26

*Graves v. Standard Ins. Co.*,
    2015 WL 13714166 (W.D. Ky. May 22, 2015)............................24

*Gruttadauria v. Fazio*,
    2007 WL 1100439 (N.D. Ohio Apr. 10, 2007)............................30

*Gugliotta v. Oldham Cnty. Bd. of Educ.*,
    2018 WL 2171347 (Ky. Ct. App. May 11, 2018)........................19

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)......................................................................12

*Habich v. City of Dearborn*,
    331 F.3d 524 (6th Cir. 2003) .................................................31, 32

ii

*Halle v. Banner Indus. of N.E., Inc.*,
    453 S.W.3d 179 (Ky. Ct. App. 2014) ............................................................................18, 19

*Hancock v. Dodson*,
    958 F.2d 1367 (6th Cir. 1992) ........................................................................................18

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ..........................................................................................27

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
    668 F.3d 393 (6th Cir. 2012) ...............................................................................5, 11, 12

*Heritage Guitar, Inc. v. Gibson Brands, Inc.*,
    2022 WL 1954361 (W.D. Mich. June 6, 2022) ..........................................................22, 29

*James v. Hampton*,
    513 F. App'x 471 (6th Cir. 2013) ...................................................................................31

*Jones v. Progressive Cas. Ins. Co.*,
    No. 6:18-CV-21-REW-HAI, 2018 WL 3345290 (E.D. Ky. July 9, 2018) ............................18

*Jones v. Univ. Med. Ctr., Inc.*,
    2025 WL 1006118 (Ky. Ct. App. Apr. 4, 2025) ...............................................................17

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) ........................................................................................9, 10

*Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*,
    24 F. Supp. 2d 755 (W.D. Ky. 1998) ..............................................................................17

*Laudien v. Caudill*,
    92 F. Supp. 3d 614 (E.D. Ky. 2015) .................................................................................6

*Lawrence for Est. of Hoffman v. Madison County*,
    No. 5:13-CV-383-GFVT-REW, 2015 WL 13636281 (E.D. Ky. Feb. 24, 2015) ...................18

*Love v. Johnson*,
    2016 WL 106612 (E.D. Mich. Jan. 10, 2016) ..................................................................20

*McIlwain v. Dodd*,
    2022 WL 492986 (W.D. Ky. Feb. 17, 2022) ....................................................................17

*McKenzie v. Allconnect, Inc.*,
    369 F. Supp. 3d 810 (E.D. Ky. 2019) ..............................................................................13

*McPherson v. Kelsey*,
    125 F.3d 989 (6th Cir. 1997) ...........................................................................................8

*Med. Marijuana, Inc. v. Horn*,
    604 U.S. 593 (2025)..................................................................................13

*Mitchell v. Chapman*,
    343 F.3d 811 (6th Cir. 2003) .......................................................................8

*Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*,
    2020 WL 1867939 (E.D. Va. Apr. 14, 2020) ...........................................11

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*,
    118 F. Supp. 3d 646 (D.N.J. 2015)............................................................26

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
    694 F.3d 783 (6th Cir. 2012) ...................................................................6, 7

*P.R. Tel. Co. v. San Juan Cable LLC*,
    874 F.3d 767 (1st Cir. 2017)......................................................................27

*Pennzoil Co. v. Texaco, Inc.*,
    481 U.S. 1 (1987) .......................................................................................31

*Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*,
    277 S.W.3d 255 (Ky. Ct. App. 2008) ..................................................19, 20

*Plastic Surgeons of Lexington, PLLC v. Liberty Mut. Ins. Co.*,
    No. 5:18-CV-548-REW-MAS, 2021 WL 4184887 (E.D. Ky. Jan. 5, 2021)..........................30

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
    219 F.3d 92 (2d Cir. 2000).........................................................................27

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) .....................................................................................21

*Racetech, LLC v. Ky. Downs, LLC*,
    169 F. Supp. 3d 709 (W.D. Ky. 2016).......................................................29

*Rajaratnam v. Motley Rice, LLC*,
    449 F. Supp. 3d 45 (E.D.N.Y. 2020) .........................................................10

*Raney v. Allstate Ins. Co.*,
    370 F.3d 1086 (11th Cir. 2004) ..............................................................9, 10

*Relevant Grp., LLC v. Nourmand*,
    2022 WL 2916860 (C.D. Cal. July 25, 2022).............................................11

*Rondigo, LLC v. Township of Richmond, Michigan*,
    2012 WL 1021726 (E.D. Mich. Mar. 27, 2012) ........................................29

*Saltire Indus., Inc. v. Waller, Landsen, Dortch & Davis LLC*,
    491 F.3d 522 (6th Cir. 2007) ...................................................................................18, 32

*Sanderson v. HCA-The Healthcare Co.*,
    447 F.3d 873 (6th Cir. 2006) ...........................................................................................5

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
    2013 WL 2181185 (E.D. Tenn. May 20, 2013)..............................................................26

*Slorp v. Lerner, Sampson & Rothfuss*,
    587 F. App'x 249 (6th Cir. 2014) ...........................................................................6, 13, 14

*Smith v. Alice Peck Day Mem'l Hosp.*,
    148 F.R.D. 51 (D.N.H. 1993) .......................................................................................18

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
    833 F.3d 512 (5th Cir. 2016) ...........................................................................................9

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................................28, 29

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013)..........................................................................................................30

*Stryker Corp. v. Ridgeway*,
    2015 WL 5308038 (W.D. Mich. Sept. 10, 2015) ...........................................................23

*Sykes v. Mel Harris & Assocs., LLC*,
    757 F. Supp. 2d 413 (S.D.N.Y. 2010).....................................................................13, 14

*Tocco v. Richman Greer Pro. Ass'n*,
    553 F. App'x 473 (6th Cir. 2013) ...................................................................................17

*Tree of Life Christian Sch. v. City of Upper Arlington*,
    905 F.3d 357 (6th Cir. 2018) ...........................................................................................8

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.*,
    953 F.3d 955 (7th Cir. 2020) .........................................................................................27

*Ultraclear Epoxy, LLC v. Epodex USA Corp.*,
    2024 WL 966876 (M.D. Tenn. Mar. 6, 2024) ..........................................................26, 28, 29

*UMB Bank, N.A. v. Guerin*,
    89 F.4th 1047 (8th Cir. 2024) ...........................................................................................9

*United Parcel Serv. Co. v. Rickert*,
    996 S.W.2d 464 (Ky. 1999).............................................................................................16

*United States v. Corrado*,
    227 F.3d 543 (6th Cir. 2000) ...........................................................................11

*United States v. Hansmeier*,
    2017 WL 8947193 (D. Minn. July 24, 2017), *report and recommendation
    adopted*, 2017 WL 3971874 (D. Minn. Sept. 8, 2017), *aff'd*, 988 F.3d 428 (8th
    Cir. 2021) ...............................................................................................................8

*United States v. Hills*,
    27 F.4th 1155 (6th Cir. 2022) ....................................................................14, 15

*United States v Pendergraft*,
    297 F.3d 1198 (11th Cir. 2002) ......................................................................10

*United States v. Turkette*,
    452 U.S. 576 (1981).............................................................................................5

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-
    CIO*,
    31 F.3d 800 (9th Cir. 1994) .............................................................................27

*Venetian Casino Resort, L.L.C. v. N.L.R.B.*,
    484 F.3d 601 (D.C. Cir. 2007) ........................................................................29

*VIBO Corp. v. Conway*,
    669 F.3d 675 (6th Cir. 2012) ...............................................................20, 21, 27

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    349 F. Supp. 3d 881 (N.D. Cal. 2018) ............................................................13

*Wamer v. Univ. of Toledo*,
    27 F.4th 461 (6th Cir. 2022) ..............................................................................4

*Watts v. Burkhart*,
    854 F.2d 839 (6th Cir. 1988) ...........................................................................31

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) ...........................................................................27

*Westmac, Inc. v. Smith*,
    797 F.2d 313 (6th Cir. 1986) ...........................................................................25

*Williams v. Duke Energy Int'l, Inc.*,
    681 F.3d 788 (6th Cir. 2012) .............................................................................5

*Yung v. Thornton*,
    563 S.W.3d 22 (Ky. 2018)................................................................................17

**Statutes**

18 U.S.C. § 1341 .................................................................................................5, 8

18 U.S.C. § 1343 .................................................................................................5, 8

18 U.S.C. § 1503 ...................................................................................................5

18 U.S.C. § 1512(c) ...............................................................................................5

18 U.S.C. § 1961(5) ...............................................................................................5

18 U.S.C. § 1962(a) ...............................................................................................8

18 U.S.C. § 1962(c) ...............................................................................................5

18 U.S.C. § 1962(d) .............................................................................................11

28 U.S.C. § 1332 .................................................................................................15

*"**Sunlight is said to be the best of disinfectants.**"*

– Justice Louis D. Brandeis, *What Publicity Can Do*, Harper's Weekly, Dec. 20, 1913, at 10.

## INTRODUCTION

The question before the Court is whether 3M's detailed First Amended Complaint plausibly alleges four causes of action: (1) civil RICO, (2) RICO conspiracy, (3) fraud, and (4) civil conspiracy. As explained below, the answer is yes. Defendants do not deny the core conduct alleged in the Complaint. Instead, Defendants offer their interpretations of the evidence, which may be appropriate arguments to a jury when the time comes, but are not sufficient to defeat 3M's allegations at the pleading stage. To the extent Defendants advance legal arguments, their analysis is incorrect—the case law supports denial of their motions.

Defendants' blanket invocation of the *Noerr-Pennington* doctrine is misplaced. *Noerr-Pennington* provides immunity for valid efforts to petition the court for redress. It is black-letter law that the doctrine does not absolve Defendants from engaging in "sham" litigation that abuses the judicial process and causes injury, as plausibly alleged here. Indeed, Defendants' wrongdoing as alleged is the textbook exception to *Noerr-Pennington* immunity. Martin and Givens for good reason do not join Hammond's stand-alone request that the Court apply *Younger* abstention. That doctrine simply does not apply to private civil litigation (like the dust mask claims) involving no state actor or important state interest. Moreover, 3M's RICO and related allegations in the Complaint here are not at issue in the state proceedings, nor could they have been, which is another reason why *Younger* abstention does not apply. The bottom line is, no good grounds for immunity or abstention exist.

The Court should deny the motions to dismiss and allow this case to go forward so that the light of day can shine on the full extent of Defendants' wrongdoing.

## OVERVIEW OF THE FIRST AMENDED COMPLAINT

Defendants Hammond, Martin, and Givens are attorneys, each with his own practice based in Kentucky, Texas, and Mississippi, respectively. First Amended Complaint (D.E. 40, "Compl.") ¶¶ 11, 16, 18. Together, they exploited the coal-worker population of eastern Kentucky to carry out a massive fraud scheme against 3M for their own financial benefit. *Id.* ¶¶ 32–52. Over three years, they filed and prosecuted more than 850 personal injury lawsuits, knowing many were false, to force 3M into expensive litigation and inflated settlements. *Id.* ¶¶ 4, 44–50.

Defendants combined these lawsuits into cookie-cutter complaints filed en masse in state courts. *Id.* ¶¶ 3, 70–91. Those complaints allege a coal worker developed black lung disease because of 3M's allegedly faulty dust mask. *Id.* ¶¶ 92–101. Defendants included claims they knew were false to exert pressure on 3M. *Id.* ¶¶ 44–49, 54–60. They knew that the more claims they filed, the more 3M would be forced to spend, and the more they could demand in settlement negotiations, thus achieving their goal: bigger checks for themselves at 3M's (and their clients') expense. *Id.* Over the course of multiple years, Defendants lied to their clients, lied to 3M, and lied to the courts about the validity of these claims and caused interstate mailings, filings, and other communications to be made in furtherance of the scheme. *See, e.g.*, *id.* ¶¶ 7, 52–60, 197.

Each Defendant played a key role in the enterprise. Hammond is a local attorney who, prior to involvement in this scheme, had no experience litigating product liability claims. *Id.* ¶ 37. Yet, as early as 2016, he solicited coal workers to file dust mask claims, making empty promises of massive payouts if they filed against 3M. *Id.* ¶¶ 61–62, 103–107. Hammond knew from information learned during the intake process that many of these workers had no viable claim against 3M because they did not wear a dust mask, did not wear a *3M* mask specifically, and/or had no cognizable injury. *Id.* ¶¶ 62–64. Hammond (or his staff at his direction) began filing the claims anyway. *Id.* ¶¶ 65–66, 113–114. By the time complaints were filed, Hammond also knew

2

many claims were statutorily time-barred. *Id.* ¶¶ 67–68, 103–108. Hammond shared the intake forms and other records containing disqualifying information with Martin and Givens, who thereafter knowingly prosecuted bogus claims against 3M. *Id.* ¶¶ 65, 116.

In 2020, Hammond, Martin, and Givens executed agreements to jointly represent the coal workers Hammond solicited. *Id.* ¶¶ 38–39. Martin knew as soon as he saw the first complaint that it included false claims. *Id.* ¶¶ 115, 150. Martin and Givens knew from the intake forms and records in their clients' files that other complaints did too. *Id.* ¶¶ 107–108, 114–116. And yet, they did not dismiss these claims; they prosecuted them instead. *Id.* ¶¶ 113, 150. Martin and Givens filed appearances and motions, prepared and exchanged discovery, communicated with 3M counsel, and appeared at depositions and court hearings in cases they knew to be without a factual or legal basis. *See, e.g.*, *id.* ¶¶ 118, 124–130.

Defendants made false representations in filings, discovery, and communications with 3M and the courts to perpetuate the fraudulent claims for as long as possible. *See, e.g.*, *id.* ¶¶ 53–60, 92–111, 122–129. They dismissed these claims only when necessary to prevent 3M from discovering the fraud, such as shortly before a plaintiff's scheduled deposition. *Id.* ¶¶ 135–136. Defendants lied to 3M and their clients, who were still expecting to win their cases, about the reason for those dismissals. *Id.* ¶ 137.

Meanwhile, Defendants used the fraudulent cases as bargaining chips in settlement negotiations with 3M—demanding higher settlements in exchange for dismissals of cases they knew were fraudulent to begin with. *Id.* ¶¶ 131–134, 161. Martin led these negotiations, while Hammond continued building the inventory and Givens managed day-to-day activity in the litigation. *Id.* ¶ 37. They agreed to split the proceeds of their wrongdoing. *Id.* ¶¶ 38–39.

Despite Defendants' efforts, the scheme began to become exposed in March 2023. *Id.* ¶¶ 168–175. A court in Pike County found that Defendants had submitted a "materially false" affidavit to avoid summary judgment on a claim they knew was baseless. *Id.* ¶¶ 125, 140–145. Defendants immediately pivoted to damage control to try to avoid scrutiny and blame. For example, Hammond directed his employee to stash evidence of the fraud in a secret storage locker and to tell no one of its whereabouts. *Id.* ¶¶ 188–190. Martin and Givens withdrew from some dust mask cases and proclaimed falsely to the courts and 3M that they knew nothing about the fraudulent claims. *Id.* ¶¶ 163–175, 178–179. However, just months earlier in January 2023, Martin admitted in an errant text message that "so many" of the claims being filed were "frivolous." *Id.* ¶ 149. His words.

As a result of Defendants' fraud scheme, 3M spent millions of dollars in legal fees and costs investigating, litigating, and negotiating settlement of Defendants' inventory that was inflated with fraudulent claims. *Id.* ¶¶ 48, 205, 216, 225.

## LEGAL STANDARD

The legal standard is well familiar to the Court. To survive a motion to dismiss, the Complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "must construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022) (quotation omitted). "Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low." *El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 739 (6th Cir. 2015). For claims based in fraud, the plaintiff must specify "the who, what, when, where, and how of the

alleged fraud" to move forward. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quotation omitted). The rules require sufficient specificity to put defendants on notice as to the nature of the claim; they "do not require omniscience." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). 3M has done that and more.

## ARGUMENT

### I.    Count One plausibly alleges Defendants violated RICO.

To prevail on a civil RICO claim under 18 U.S.C. § 1961 *et seq.*, as alleged in Count One, 3M must allege that each Defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," and that "some direct relation" exists between the racketeering acts and the injury suffered. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404–05 (6th Cir. 2012) (quotation omitted); 18 U.SC. § 1962(c). An "association-in-fact enterprise" is merely a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). A "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years of each other. *Heinrich*, 668 F.3d at 409; 18 U.S.C. § 1961(5). 3M alleges that Defendants formed an association-in-fact enterprise to carry out a massive scheme to defraud 3M and that each Defendant committed more than two—and collectively dozens, if not hundreds, of—violations of the mail and wire fraud statutes to effectuate that scheme, causing 3M to spend millions of dollars defending against the scheme. *See, e.g.*, Compl. ¶¶ 203–214, 216; 18 U.S.C. §§ 1341, 1343. 3M also alleges Hammond engaged in obstruction of justice when he hid critical records from 3M and the courts to prevent exposure of the mail and wire fraud violations. *See, e.g.*, Compl. ¶ 215; 18 U.S.C. §§ 1503, 1512(c).

### A.    Count One plausibly alleges an association-in-fact enterprise.

3M alleges Defendants formed an association-in-fact enterprise by engaging in coordinated conduct toward a common purpose. *See* Compl. ¶¶ 33, 207; *Boyle*, 556 U.S. at 946. The Supreme Court has made clear that an association-in-fact enterprise "is simply a continuing unit that functions with a common purpose," and that it requires just three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946–48. Each feature is present here.

A primary purpose of the enterprise was to file claims en masse to exert pressure on 3M and increase settlement payouts to Defendants. *See, e.g.*, Compl. ¶¶ 33, 44–50. Defendants established relationships among themselves by entering into fee-sharing agreements, working together to file and prosecute claims, sharing resources and office space, exchanging litigation documents and other records, and coordinating communications to clients, 3M, and the courts. *Id.* ¶¶ 33–43. The scheme began at least as early as 2020, long enough for Defendants to prepare and prosecute hundreds of claims and engage in dozens, if not hundreds, of racketeering acts. *See, e.g.*, *id.* ¶¶ 33, 36–37, 42–43. These facts plausibly establish an enterprise. *See, e.g.*, *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794–95 (6th Cir. 2012) (finding that complaint delineating specific roles and relationships and alleging enterprise functioned at last five years for common purpose of promoting fraudulent plan to generate commissions and related fees sufficiently alleged required "organizational structure" under *Boyle*); *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 265 (6th Cir. 2014); *see also, e.g.*, *Laudien v. Caudill*, 92 F. Supp. 3d 614, 620 (E.D. Ky. 2015) (holding that plaintiff sufficiently alleged the "only structure required": "a common purpose, with relationships among the defendants, and longevity").

Martin, but not Hammond or Givens, claims the enterprise allegations fail because 3M "alleges no activity separate and apart from the racketeering activity" and "alleges the enterprise's entire purpose was the racketeering activity." Defendant Martin's Motion to Dismiss (D.E. 66, "Martin Mot.") at 28–29. The Supreme Court has expressly rejected both arguments, holding that while "enterprise" and "pattern of racketeering" are separate elements of a RICO violation, (1) a pattern of racketeering activity may be sufficient to prove the existence of an enterprise, and (2) an enterprise may be formed "solely for the purpose of carrying out a pattern of racketeering acts." *Ouwinga*, 694 F.3d at 794 (citing *Boyle*, 556 U.S. at 951) (reversing dismissal for failure to allege "structure distinct from pattern of racketeering"). 3M has alleged that Defendants associated together for a common purpose of engaging in a course of conduct; no more is required. *See Boyle*, 566 U.S. at 945.

Martin also separately argues the enterprise lacks sufficient organizational structure because, he contends, the Defendants engaged in litigation "with no meaningful difference in each Defendant's established duties." Martin Mot. at 28. But the Supreme Court has rejected attempts to impose formal requirements like "role differentiation" under RICO, holding instead that an enterprise may be "an informal group" with "not much structure." *Boyle*, 556 U.S. at 948 (cleaned up). Nevertheless, the Complaint plainly describes Defendants' respective roles in the scheme, which go beyond duties relating to the litigation. *See, e.g.*, Compl. ¶ 37. It makes no difference that Defendants' responsibilities in the scheme sometimes overlap or shift over time. *See Boyle*, 556 U.S. at 948 ("Members of the group need not have fixed roles; different members may perform different roles at different times.").

### B.    Count One plausibly alleges racketeering activity.

Defendants do not deny that mail and wire fraud and obstruction of justice are RICO predicate acts or that 3M has alleged these claims with sufficient particularity.[1] They argue only that litigation activity alone cannot be the basis for RICO predicate acts of mail or wire fraud. *See* Defendant Givens' Motion to Dismiss (D.E. 63, "Givens Mot.") at 21–23; Motion by Defendant Hammond to Dismiss (D.E. 64, "Hammond Mot.") at 19–22; Martin Mot. at 21–22, 31. Defendants' attempt to establish a categorial "litigation activity" exception to RICO fails for several reasons.

First, there is no statutory basis for excepting litigation activity from RICO. In matters of statutory interpretation, courts "look first to the text." *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 367 (6th Cir. 2018). "[If] the meaning of the language is plain, then the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.*; *see also Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) (holding "the plain meaning of the statute controls"). The federal RICO statute defines "racketeering activity" to include violations of mail and wire fraud. 18 U.S.C. § 1962(a) (citing 18 U.S.C. §§ 1341, 1343). The statute does not exempt litigation activity from that definition. *See id.* Nor do the mail and wire fraud statutes exempt litigation activity from their domain. *See* 18 U.S.C. §§ 1341, 1343. Finding otherwise would be inconsistent with the plain language of the statute. Indeed, "numerous successful mail and wire fraud prosecutions have been based, in whole or in part, on conduct that occurs in civil litigation." *United States v. Hansmeier*, 2017 WL 8947193, at

---

[1] Martin in passing states that 3M failed to plead mail or wire fraud with particularly but he provides no substantive argument or authority to support his position. *See* Martin Mot. at 33. The Court should not consider this undeveloped argument. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

*4 (D. Minn. July 24, 2017) (citing cases), *report and recommendation adopted*, 2017 WL 3971874 (D. Minn. Sept. 8, 2017), *aff'd*, 988 F.3d 428 (8th Cir. 2021).

Second, Defendants' out-of-circuit authority does not, as Defendants suggest, establish a categorial bar. For example, in *Kim v. Kimm*, while the Second Circuit held that "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act," it expressly "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless" and limited its holding to situations in which "a defendant engaged in a ***single*** frivolous, fraudulent or baseless lawsuit." 884 F.3d 98, 104–05 (2d Cir. 2018) (emphases added). Likewise, in *UMB Bank, N.A. v. Guerin*, the Eighth Circuit made clear it was "not holding that litigation activities can *never* serve as a RICO predicate" or adopting "a blanket exception of litigation activities from the mail, wire and bank fraud statutes." 89 F.4th 1047, 1054–55 (8th Cir. 2024) (cleaned up). Other courts' analyses are similarly limited because they turned not on the class of conduct alleged, but on elements of the predicate acts at issue. In *Snow Ingredients, Inc. v. SnoWizard, Inc.*, the predicate acts were obstruction of justice and witness tampering, which (unlike mail and wire fraud) require "corrupt" conduct. 833 F.3d 512, 525 (5th Cir. 2016). The Fifth Circuit held the alleged "bad faith litigation tactics" did not constitute obstruction or witness tampering—not because they were litigation conduct per se, but because they were not "corrupt" actions. *Id.* In *Raney v. Allstate Insurance Co.*, the RICO claim was based on Hobbs Act extortion, which (unlike mail and wire fraud) requires "wrongful" conduct. 370 F.3d 1086, 1087–1088 (11th Cir. 2004). The Eleventh Circuit held that "neither the threat to litigate nor the fabrication of evidence" made an action "wrongful" within the meaning of the Hobbs Act. *Id.* And the Eleventh Circuit held only (and unsurprisingly) that litigation conduct could not establish mail fraud as a predicate act "absent any intent to deceive"—a required

9

element for a mail fraud claim. *Id.* at 1088 n.2 (citing *United States v Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002)); *see also, e.g.*, *Gabovitch v. Shear*, 70 F.3d 1252 (1st Cir. 1995) (rejecting mail and wire fraud allegations for lack of specificity and reliance on perjury, not an act of racketeering). While the Tenth Circuit found allegations of "bad-faith litigation" did not establish the predicate act of extortion, it held in the same case that mail and wire fraud based on false statements made to induce settlement or ward off litigation "are proper predicate acts." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258–59 (10th Cir. 2003).

Third, 3M has alleged that Defendants engaged in fraudulent activity beyond the traditional litigation context. The Complaint alleges fraudulent tactics far beyond a single lawsuit. Moreover, the alleged conduct is not limited to litigation activity. Defendants engaged in out-of-court conduct as well, including mass solicitation of coal workers, lying to clients and their families about claims and reasons for dismissals, intimidating employees to cooperate in the scheme, encouraging and coaching clients to perpetuate the lie, manipulating and forging documents, concealing evidence, and more to advance and conceal the scheme. *See, e.g.*, Compl. ¶¶ 12, 61–68, 122–125, 128–129, 137; *see also, e.g.*, *Kim*, 884 F.3d at 104–05 (distinguishing case where "entire alleged scheme involved the creation of fraudulent court documents" with allegations that defendants "use[d] litigation to carry out scheme" but also engaged in out-of-court actions); *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 71 (E.D.N.Y. 2020) (distinguishing between allegations of false filings in single case and allegations where "gravamen … of the racketeering activity" was "use the of courts to obtain default judgments *en masse*" and lawsuits "were mere perfunctory steps to cash in on a portfolio of defaulted debts"). Courts routinely permit RICO claims to go forward in situations, like here, where the defendants' conduct was broader than "traditional" or "pure" litigation activity, including within the Second, Fourth, Fifth, Eighth, Ninth, and D.C. Circuits.

*See, e.g.*, *Relevant Grp., LLC v. Nourmand*, 2022 WL 2916860, at *11 (C.D. Cal. July 25, 2022) (allowing RICO claim involving "many allegedly sham legal objections and challenges raised in a complex regulatory space over many years"); *Carroll v. U.S. Equities Corp.*, 2020 WL 11563716, at *9–10 (N.D.N.Y. Nov. 30, 2020) (allowing RICO claim alleging fraudulent litigation activity and conduct "necessary to support the massive fraud scheme" that went "beyond proper legal representation" and "beyond any of the particular disputes"); *Navient Sols., LLC v. L. Offs. of Jeffrey Lohman*, 2020 WL 1867939, at *8 (E.D. Va. Apr. 14, 2020) (finding pattern of mail and wire fraud sufficiently alleged where defendants "recruited … debtors into the scheme [to manufacture TCPA claims] by making false statements as to the scope, efficacy, and risk entailed in the debt-relief program they purported to offer"); *CSX Transp., Inc. v. Gilkison*, 2012 WL 1598081, at *10 (N.D.W. Va. May 3, 2012) (rejecting argument that "routine litigation activity" cannot serve as RICO predicate and finding "the alleged mail and wire fraud violations in this case amount to more than mere claims for abuse of process or malicious prosecution").

3M also alleges obstruction of justice against Hammond, which he does not challenge. Martin and Givens are liable for those predicate acts as co-conspirators under 18 U.S.C. § 1962(d). *See United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000).

### C.    Count One plausibly alleges a pattern of racketeering.

A pattern of racketeering requires that the alleged predicate acts be related and amount to or pose a threat of continued criminal activity. *See Heinrich*, 668 F.3d at 409. Martin contends 3M fails to allege continuity. *See* Martin Mot. 33–35. Continuity can be shown through either a "'closed-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)." *Heinrich*, 668

F.3d at 409 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–39 (1989)). The alleged predicate acts are continuous under either theory.

3M has alleged numerous related mail and wire fraud violations over a span of at least three years. *See, e.g.*, Compl. ¶ 42. This satisfies the "closed-ended" pattern requirement. *See Brown v. Cassens Transp. Co.*, 546 F.3d 347, 355 (6th Cir. 2008) ("[A] series of related predicate acts that span well over three years … constitutes a period of closed-ended continuity."). The alleged scheme also constitutes an "open-ended" pattern because Defendants could have added to their inventory of claims against 3M indefinitely into the future. There was no lack of coal workers in eastern Kentucky and, therefore, no "built-in ending point" to the scheme. *Heinrich*, 668 F.3d at 410 (finding adoption scheme was "open-ended" because there was "no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption"). Martin claims he withdrew from the scheme in April 2023, but that self-serving claim changes nothing (especially at this point of the litigation where 3M's allegations must be considered true). *See* Martin Mot. at 35. "[T]he threat of continuity must be viewed at the time the racketeering activity occurred." *Heinrich*, 668 F.3d at 410. "Subsequent events are irrelevant." *Id.* (finding arrest or guilty verdict does not impact analysis). There is no reason to believe Defendants would not still be filing fraudulent claims had the fraud not been exposed. *See Blue Cross & Blue Shield of Mich. v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (finding open-ended pattern where there was "no reason to believe [defendant] would not still be submitting false claims" "if he had not been caught").

### D. Count One plausibly alleges cognizable RICO injury.

Martin alone takes issue with 3M's alleged RICO injuries on a few grounds, none of which is valid. First, he claims the cost of defending the dust mask cases is "at best a speculative injury." Martin Mot. at 16, 38. These defense costs are hardly speculative. As alleged, and as the scheme

intended, 3M has in fact incurred these costs each day it pays attorneys to defend against the hundreds of cases Defendants put in motion. *See, e.g.*, *Slorp*, 587 F. App'x at 263 (plaintiff sufficiently alleged RICO injury of attorneys' fees incurred in connection with foreclosure action caused by defendants' fraud); *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 427–28 (S.D.N.Y. 2010) (same for legal costs incurred challenging default judgments sought in violation of RICO). The quantum of 3M's injury will be determined later in this case.

The same is true of 3M's reputational harm. Martin does not dispute that Defendants' scheme caused such harm, or that business injuries resulting from reputational harm are cognizable under RICO—nor could he. *See Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025) (holding RICO plaintiff can seek damages for business or property loss resulting from personal injury because focus is on "the *kinds* of harm for which the plaintiff can recover, not the *cause*"); *see also, e.g.*, *Cement-Lock v. Gas Tech. Inst.*, 2005 WL 2420374, at *13 (N.D. Ill. Sept. 30, 2005) (injury to business reputation resulting in economic losses is compensable under RICO). Martin argues only, without any basis, that 3M cannot quantify the amount of harm attributable to the claims Defendants filed. *See* Martin Mot. 16. An accounting of damages is not required at this stage. *See, e.g.*, *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 818 (E.D. Ky. 2019) (no requirement to demonstrate "amount of damages" at pleading stage); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 890 (N.D. Cal. 2018) ("[W]hat matters at the pleading stage is that the fact of damage, rather than the amount of damage, is not speculative.").

Martin argues next that 3M fails to establish the directness requirement for RICO statutory standing because, he says, 3M is unable to show a causal link between the RICO predicates and the alleged injury. His sole argument hinges on whether 3M has sufficiently alleged any predicate

acts at all which, as explained above, it has. *See supra* Section I.B. 3M has also alleged statutory standing by showing the scheme Defendants perpetrated through a series of mailings, filings, and communications constituting mail and wire fraud caused 3M to spend money needlessly and unwittingly investigating and defending baseless claims and negotiating settlements against an inflated inventory. *See, e.g.*, Compl. ¶¶ 6, 44–48, 196–199, 205, 211–216. Defendants' conduct and 3M's injuries are sufficiently alleged to be directly related. *See, e.g.*, *Slorp*, 587 F. App'x at 263 (finding attorney's fees incurred in connection with foreclosure action were proximately caused by baseless initiation of foreclosure proceedings in violation of RICO); *Sykes*, 757 F. Supp. 2d at 427–28 (holding that injuries, including legal costs, were proximately caused by pursuit and enforcement of default judgments in violation of RICO).

## II.    Count Two plausibly alleges a RICO conspiracy.

RICO conspiracy as alleged in Count Two requires merely "that a defendant intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO claim]," and "it suffices that he adopt the goal of furthering or facilitating the [] endeavor." *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022) (citation omitted). 3M need only allege for each Defendant that he "agree[d] that at least two predicate acts would be committed by at least one of the coconspirators." *Id.* A RICO conspiracy "does not require proof that the defendant committed any predicate acts," that he "agreed to commit predicate acts himself," or "even that any overt acts have been committed." *Id.* (quotations omitted). Conversely, committing predicate acts is sufficient proof a defendant agreed to commit them. *Id.* An agreement can otherwise be inferred from the defendant's actions. *Id.*

3M alleges that each Defendant agreed to jointly prosecute the dust mask inventory with each playing a role that would require him to violate the mail and/or wire fraud or obstruction of justice statutes, and that each in fact committed more than two predicate acts in furtherance of the

scheme. Compl. ¶¶ 37–39, 41–42, 50–52, 218. 3M alleges each Defendant "agree[d] that at least two predicate acts would be committed by at least one of the coconspirators," as required to plead the RICO conspiracy claim. *Hills*, 27 F.4th at 1174. 3M alleges that Defendants entered into agreements with one another to jointly represent the dust mask clients and to share the profits of the enterprise among themselves. Compl. ¶¶ 38–39. Defendants agreed that each of them would play an important role in the scheme that would require him to make mailings, filings, and other communications in violation of the mail and wire fraud statutes (*id.* ¶¶ 26–37), and that they would conceal the scheme through various means that would violate those same statutes and/or constitute obstruction of justice (*id.* ¶¶ 50, 218). And while not required, 3M's allegations that each Defendant in fact engaged in mail and/or wire fraud or obstruction to further the scheme are, alone, dispositive. *See, e.g.*, *id.* ¶¶ 51–60, 196–199; *see also, e.g.*, *Hills*, 27 F.4th at 1174 (finding that "when [a defendant] does commit predicate acts, that is sufficient proof that he agreed to commit them" for RICO conspiracy) (citation omitted).

No Defendant disputes that he agreed to work with the others to compile, file, and prosecute the inventory of claims described in the Complaint, or to coordinate related communications with dust mask clients, 3M, and the courts. Defendants argue only that the alleged scheme does not amount to a substantive RICO claim and, therefore, cannot support a RICO conspiracy claim. *See* Hammond Mot. at 21–22, Martin Mot. at 36; Givens Mot. at 25. They are wrong about the substantive RICO claim for all the reasons already explained. *See supra* Section I. The Court should reject this argument.

## III. Count Three plausibly alleges fraud under Kentucky law.

Defendants argue 3M's state law fraud claim—over which the Court has an independent jurisdictional bases under 28 U.S.C. § 1332—is not sufficiently alleged and is barred under Kentucky's judicial statement privilege. The Court should reject both arguments.

Under Kentucky law, a fraud claim as alleged in Count Three must include (a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury. *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). 3M alleges each Defendant made material misrepresentations in dust mask complaints (which were repeated in discovery and other communications thereafter), knowing or with reckless indifference to the falsity of those statements, and falsely certified that they had made a reasonable inquiry into the claims, all with the intention that 3M would rely on these misrepresentations, assume the claims were not fraudulent, and litigate and negotiate accordingly. *See, e.g.*, Compl. ¶¶ 219–224. 3M alleges further that it did rely on these misrepresentations and incurred legal fees and costs evaluating, defending, and negotiating settlement of fraudulent claims that it would not have sustained absent Defendants' misrepresentations. *Id.* ¶ 225. Hammond and Martin collectively, and unsuccessfully, challenge 3M's pleading of three of these elements. Givens does not challenge any of them.

Martin claims 3M has not identified any false statements attributed to him. *See* Martin Mot. at 36–37. To the contrary, 3M identifies specific false statements attributed to each Defendant including, by way of example, false statements made in complaints filed by Hammond and prosecuted by Martin and Givens (Compl. ¶¶ 92, 96, 99, 102–104), discovery responses signed and served by Martin (*id.* ¶¶ 126–127), communications from all Defendants to 3M counsel regarding the reason certain claims were dismissed (*id.* ¶ 135), Martin's settlement communications with 3M counsel (*id.* ¶ 132), an affidavit submitted by all Defendants to avoid summary judgment (*id.* ¶ 140), and in-court statements by Martin perpetuating the lie in the affidavit (*id.* ¶ 146).

16

Hammond and Martin claim next that 3M could not have relied on the fraudulent claims because it contested them in litigation. *See* Hammond Mot. at 22–24; Martin Mot. at 37–38. As alleged, 3M relied on Defendants' certifications that they made a reasonable inquiry into the factual and legal bases for these claims when formulating its defense strategy, calculating risk exposure, and assigning settlement value to individual cases. Compl. ¶¶ 205, 223–225. 3M had no reason to believe—even in adversarial litigation—that the claims it defended against were outright fraudulent from the outset or, for example, that Defendants' discovery responses were patently false. None of the cases Defendants cite hold otherwise. Nor do they even involve allegations of reliance on opposing counsel's statements made in pleadings or during litigation. *See, e.g.*, *Tocco v. Richman Greer Pro. Ass'n*, 553 F. App'x 473, 475 (6th Cir. 2013) (no reasonable reliance on counsel's pre-litigation assurances that client would repay his debt); *Jones v. Univ. Med. Ctr., Inc.*, 2025 WL 1006118, at *5 (Ky. Ct. App. Apr. 4, 2025) (no fraud claim where employee could not have reasonably relied on employer's representations regarding severance policy and termination); *McIlwain v. Dodd*, 2022 WL 492986, at *11 (W.D. Ky. Feb. 17, 2022) (no fraud claim where plaintiff alleged sheriff (not plaintiff) relied on opposing counsel's statement that plaintiff violated restraining order); *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 771 (W.D. Ky. 1998) (allowing fraud claim based on plaintiffs' alleged reliance on information disseminated by tobacco companies to proceed).

Finally, Hammond argues that litigation defense costs are not recoverable on a fraud claim. *See* Hammond Mot. at 24. Not so. Under Kentucky law, "[t]he measure of damages for fraud is, as a general rule, the actual pecuniary loss sustained." *Yung v. Thornton*, 563 S.W.3d 22, 60 (Ky. 2018). Under this rule, ***any*** out-of-pocket damages that are a direct result of defendants' fraudulent activity are recoverable. *Id.* As explained already, 3M's litigation costs in investigating, defending,

17

and negotiating settlement of fraudulent claims are directly related to Defendant's scheme. *See supra* Section I.D. *Saltire Industrial, Inc. v. Waller, Landsen, Dortch & Davis LLC* is distinguishable. 491 F.3d 522 (6th Cir. 2007). There, the Sixth Circuit analyzed Tennessee and New York law—not Kentucky law. And the Sixth Circuit did not hold that attorneys' fees are in and of themselves "speculative" damages; rather, the "real problem" was that the attorneys' fees at issue in that case were predicated solely on "the cost differential of litigating … in federal court as opposed to state court." *Id.* at 530–531. That is not the case here. 3M's costs incurred defending baseless claims at all, in any court, and negotiating settlements against an inflated inventory are certain and concrete and will be calculated later in this case. *See supra* Section I.D.

Finally, Kentucky's judicial statement privilege does not apply. Where, as here, both federal and state law claims are alleged, courts apply federal privilege law to all claims to avoid conflicting application in the same case. *See, e.g.*, *Lawrence for Est. of Hoffman v. Madison County*, No. 5:13-CV-383-GFVT-REW, 2015 WL 13636281, at *2 (E.D. Ky. Feb. 24, 2015) (applying federal privilege law where federal and supplemental state law claims alleged) (citing *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992)); *Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011) (applying federal privilege law where "both bases for jurisdiction are present and where state and federal law provide competing answers") (citing cases); *Smith v. Alice Peck Day Mem'l Hosp.*, 148 F.R.D. 51, 53 (D.N.H. 1993) (same).

Regardless, even if state law applied, the judicial statement privilege would "not bar the cause of action but only render[] it unsustainable if based *exclusively* on statements privileged under that law." *Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 189 (Ky. Ct. App. 2014) (emphasis added); *Jones v. Progressive Cas. Ins. Co.*, No. 6:18-CV-21-REW-HAI, 2018 WL 3345290, at *2 (E.D. Ky. July 9, 2018) (finding judicial statement privilege is "a form of

affirmative defense … that truly affects available evidence rather than claim assertion"). As its name implies, the privilege applies only to statements made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of a judicial proceeding" that are "material, pertinent, and relevant" to the proceeding. *Halle*, 453 S.W.3d at 189. It does not protect statements "outside of, prior to, and after" judicial proceedings or "non-communicative conduct." *Id.* 3M's fraud scheme alleged in the Complaint involves statements and conduct that fall outside of the privilege (such as mass solicitation of coal workers, lies to clients during the intake process, intimidation of employees, forgery, concealing evidence) and, therefore, cannot be categorically dismissed on privilege grounds. *Id.* (affirming denial of motion to dismiss fraud and other state law claims where allegations included references to statements and conduct not protected by the privilege).

## IV.     Count Four plausibly alleges civil conspiracy under Kentucky law.

For a civil conspiracy claim as set forth in Count Four, Kentucky law requires that 3M allege "an unlawful/corrupt combination or agreement among the alleged conspirators to engage in some concerted action in order to perpetuate an unlawful act." *Gugliotta v. Oldham Cnty. Bd. of Educ.*, 2018 WL 2171347, at *4 (Ky. Ct. App. May 11, 2018). To be liable, Defendants must have "acted tortiously pursuant to a common design" or "rendered substantial assistance to others to accomplish the tortious act." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008). 3M alleges Defendants agreed to collectively prepare and prosecute hundreds of claims against 3M knowing many were fraudulent, and then did each file and prosecute those claims to defraud 3M. *See, e.g.*, Compl. ¶ 227–228.

3M sufficiently alleges an unlawful agreement among Defendants to engage in concerted action to perpetuate fraud against 3M. *See Gugliotta*, 2018 WL 2171347, at *4. The Complaint details Defendants' agreement to jointly file and prosecute an inventory of dust mask claims

knowing many were false, and the steps each took (such as soliciting coal workers, drafting and filing fraudulent claims, preparing and serving false discovery responses, forging documents, eliciting false deposition testimony, making false statements to 3M regarding dismissals) in coordination with each other to carry out the fraud. *See, e.g.*, Compl. ¶¶ 37, 51–52, 61–111, 122–130, 135–136; *see also Peoples Bank*, 277 S.W.3d at 261. Defendants argue only that the civil conspiracy claim should be dismissed because, they say, 3M fails to sufficiently plead the underlying fraud claim. *See* Hammond Mot. at 25; Martin Mot. at 39–40; Givens, Mot. at 28–29. But as explained above, 3M plausibly alleges fraud. *See supra* Section III.

## V.    Defendants fail to establish a *Noerr-Pennington* defense.

Defendants' request for blanket immunity under the *Noerr-Pennington* doctrine fails. The doctrine provides immunity from civil liability only for valid petitioning activity. It does not protect the "sham" litigation alleged here, nor does it cover the non-petitioning activity alleged in the Complaint. For either or both of those reasons, Defendants cannot carry their burden to show that the doctrine applies.[2]

### A.    The sham exception applies to 3M's claims.

The *Noerr-Pennington* doctrine provides no immunity for sham petitioning activity "not genuinely aimed at procuring favorable government action at all." *VIBO Corp. v. Conway*, 669 F.3d 675, 685 (6th Cir. 2012) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S.

---

[2] While some courts have applied the *Noerr-Pennington* doctrine beyond its original antitrust context, neither the Supreme Court nor the Sixth Circuit has extended such immunity to RICO liability. Defendants do not dispute this, but instead urge this Court to follow other circuits that have. *See, e.g.*, Martin Mot. at 18. The Court need not decide this issue of first impression in this circuit because, as explained above, the RICO claims fall squarely within the sham exception to the doctrine. *See, e.g.*, *Love v. Johnson*, 2016 WL 106612, at *1 (E.D. Mich. Jan. 10, 2016) (invoking "long-standing principle of judicial restraint" and declining to resolve issue of first impression unnecessarily).

365, 380, (1991)). The exception applies where a person "use[s] the governmental *process*—as opposed to the *outcome* of that process" to injure another. *Id.* (quoting *Omni Outdoor*, 499 U.S. at 380). The classic example is the "filing of frivolous objections … simply in order to impose expense and delay." *Id.* (quoting *Omni Outdoor*, 499 U.S. at 380). The Supreme Court has established a two-part, objective-subjective test for determining whether a lawsuit is a sham. Most circuits have also applied the sham exception where a whole series of successive lawsuits are filed without regard to the merits and for the purpose of causing injury. 3M has plausibly alleged the exception applies under both tests.

A lawsuit is a sham not entitled to *Noerr-Pennington* immunity if it is both objectively and subjectively baseless. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 60 (1993). A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *Id*. It is subjectively baseless if filed not to achieve a favorable outcome but rather to vex or harass the opposing party through the mere process of litigation. *Id.*; *Omni Outdoor*, 499 U.S. at 380.

**Objectively Baseless.** No reasonable person could expect to win a lawsuit based on made-up facts that could never be proven. As alleged in the Complaint, Defendants filed dust mask lawsuits on behalf of individuals who did not wear a dust mask, did not wear a 3M dust mask, did not suffer from black lung disease, and/or were aware of their claim more than one year before it was filed. *See, e.g.*, Compl. ¶¶ 53–57. Each deficiency is fatal to the dust mask claim. *Id*. In early 2023, before the fraud scheme was exposed, Martin unwittingly confessed to 3M in an errant text message that "so many" of these claims were meritless. *Id.* ¶¶ 149–153.

3M has identified specific, objectively baseless dust mask lawsuits in the Complaint based on its investigation to date. In some instances, the lawsuit's baselessness is obvious, for example,

because the coal worker died more than two years (even 10 or 20 years!) before their estate claim had to be filed. *See, e.g.*, *id.* ¶¶ 109–110. In other instances, Defendants' own files show that the coal worker met with Hammond and, therefore, was on notice of their claim more than one year—in some cases several years—before it was filed. *Id.* ¶¶ 67, 103, 106–108, 117. The Pike County Circuit Court confirmed that one lawsuit was baseless on these grounds. *Id.* ¶¶ 3, 12, 145–146. Coal workers have confirmed the same in bar complaints or malpractice suits filed after learning of Defendants' scheme. *Id.* ¶¶ 13–14, 104–105.[3] Martin and Givens admitted as much in motions they filed with the Pike County Circuit Court in March 2023 (*id.* ¶¶ 166–167), and Martin confirmed this again at a court hearing in 2023 (*id.* ¶¶ 107, 168) and under oath two years later (*id.* ¶¶ 108, 115). It is reasonably likely that the storage facility at which Hammond stashed original files as alleged in the Complaint (¶¶ 188–190) will demonstrate additional instances of fraudulent cases.

As for mask usage, many coal workers' files from past applications for black lung or Social Security benefits reveal they never or rarely wore a mask. *Id.* ¶ 127. Historical evidence suggests discovery will reveal similarly baseless lawsuits as only 7.4% of coal workers report wearing a mask while underground, and even then, only intermittently. *Id.* ¶¶ 29, 97. This, of course, undermines Defendants' claim that 100% of the 850+ coal workers on their roster wore a mask at all, let alone "at all times necessary in his work as a miner, including when he worked

---

[3] Hammond and Martin, but not Givens, argue an expired claim cannot be objectively baseless if accompanied by a fraud claim governed by a five-year statute of limitations. *See* Hammond Mot. at 7; Martin Mot. at 25–26. A fraud claim premised on false assertions of mask usage, product identification, or injury is also objectively baseless even if timely. Also, the statute of limitations governs individual claims, not entire complaints, so the product liability claim would still be untimely—and objectively baseless—if filed outside the one-year limit. *See, e.g.*, *Heritage Guitar, Inc. v. Gibson Brands, Inc.*, 2022 WL 1954361, at *9 (W.D. Mich. June 6, 2022) (holding "sham" exception applied to "mixed" claims).

underground" as uniformly asserted in discovery responses. *Id.* ¶ 127. It also undercuts Defendants' representations that each of those miners wore a *3M* mask each day. *Id.* ¶¶ 55, 100.

Other lawsuits are baseless because the coal worker had no cognizable injury. *Id.* ¶¶ 92–95. In several cases, Defendants failed to produce any evidence of lung injury whatsoever. *Id.* ¶ 94. For at least 43 claims, Defendants later admitted the coal-worker plaintiffs never had black lung disease to begin with. *Id.* ¶¶ 93, 155–157. Needless to say, it cannot be objectively reasonable for Defendants to have alleged claimants had black lung disease if they never did.

Accepting 3M's allegations as true, none of the fraudulent dust mask cases identified in the Complaint stood a chance. No reasonable litigant could realistically expect to win on the merits of those claims. *See, e.g.*, *Graham Packaging Co., L.P. v. Ring Container Techs., LLC*, 2025 WL 978220, at *9 (W.D. Ky. Mar. 31, 2025) (holding complaint sufficiently alleged that infringement suit based on invalid and unenforceable patent was "objectively baseless"); *Stryker Corp. v. Ridgeway*, 2015 WL 5308038, at *5 (W.D. Mich. Sept. 10, 2015) (holding complaint sufficiently alleged that claims relying on a fabricated non-compete agreement were "sham" suits not protected by *Noerr-Pennington*); *see also, e.g.*, *Ceres Protein, LLC v. Thompson Mech. & Design*, 2016 WL 6090966, at *10 (W.D. Ky. Oct. 18, 2016) (taking allegations at "face value," defendant had no objectively reasonable basis to conclude plaintiff was infringing on patent).

**Subjectively Baseless.** 3M sufficiently alleges that Defendants knew these fraudulent lawsuits were baseless. *See, e.g.*, Compl. ¶¶ 7–8, 69. Hammond knew from the intake process that certain coal workers did not wear a dust mask, did not wear a 3M dust mask, did not suffer from black lung disease, and/or had an expired claim, but he filed suits on their behalf anyway. *Id.* ¶¶ 62–64, 68. Martin and Givens knew this when prosecuting the actions because Hammond recorded this disqualifying information in intake forms that he shared with Martin and Givens,

putting them on notice if they were not already. *Id.* ¶¶ 65, 116. Defendants also knew from records in their own files that many coal workers' claims failed for these reasons. *See id.* ¶¶ 116, 117, 127 (clients' prior claim or medical records showed no mask usage and/or no injury); *id.* ¶¶ 106, 170 (spreadsheet with intake dates showed claims were time-barred). Martin admitted that he knew before joining the first Enterprise Complaint it included baseless claims against 3M (*id.* ¶¶ 38, 115) and that Defendants continued filing baseless lawsuits knowing they would likely eventually be dismissed because the coal worker did not wear a mask or have black lung disease or the claim had expired (*id.* ¶ 113). Martin and Givens continued to join cases despite knowing—and in Martin's case, admitting in writing—that "so many" were "frivolous." *Id.* ¶ 149.

The timing and structure of the filings were strategic. Defendants combined dozens, if not hundreds, of individual suits into single complaints and filed most of these mass complaints in eastern Kentucky state courts over an 18-month period. *Id.* ¶¶ 4, 69–91. Defendants filed the baseless claims to increase pressure on 3M to settle cases in the inventory at higher payouts. *Id.* ¶¶ 8, 44–46, 207. By over-burdening the courts, Defendants slowed litigation and hindered 3M's ability to vet any individual claim so they could hide the fraudulent cases—and drive up 3M's defense costs—until the latest point possible. *Id.* ¶ 48. Defendants dismissed the fraudulent cases strategically to prevent 3M, their clients, and the courts from discovering the fraud. *Id.* ¶¶ 135–136. In the meantime, they forced 3M to spend millions of dollars on meritless cases used (as originally intended) merely as bargaining chips in settlement negotiations. *Id.* ¶¶ 131–132. Each of those cases was a textbook "sham"—filed to cause delay and expense and with no intention of obtaining a favorable judgment. *See, e.g.*, *Graham Packaging*, 2025 WL 978220, at *9 (finding "sham" exception applied where defendant filed infringement suit knowing claims were baseless with intent to monopolize market); *Graves v. Standard Ins. Co.*, 2015 WL 13714166, at *6 (W.D.

Ky. May 22, 2015) (same where counsel threatened claims he knew were baseless with intent to improperly coerce physician into withdrawing prior opinions); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 643–44 (E.D. Mich. 2000) (same where infringement action prosecuted solely for delay and to exclude competitor from market).

Martin claims his motives were pure. *See* Martin Mot. at 9–12. He argues certain transcripts and filings contradict these allegations because they purportedly show Defendants dismissed baseless claims to *prevent* 3M from incurring unnecessary litigation costs. *Id*. Specifically, Martin claims that in 2021, he told a court he would "try to determin[e] as early as possible" whether he would file early dismissals because he did not want to "waste anybody's money," and the court set a deadline of September 15, 2021 for these dismissals. *Id*. at 9–10.[4]

Martin can present these excuses in closing arguments to the jury. But they have no bearing on a motion to dismiss. As alleged, Defendants did not dismiss 3M "as early as possible" and did not do so as a professional courtesy. To the contrary, they dismissed claims only when it was to their strategic benefit to do so—often just before a plaintiff's scheduled deposition or after a court-imposed deadline. *See* Compl. ¶¶ 135–136 (listing examples).

Martin's factual disputes underscore why this case must proceed. *See Westmac, Inc. v. Smith*, 797 F.2d 313, 318 (6th Cir. 1986) (acknowledging at summary judgment that "determining

---

[4] The Court should not entertain arguments about these public records because they are neither referred to in the Complaint nor central to the claims alleged, and Martin seeks to use them improperly to establish a disputed fact (his intent in dismissing cases). *See Blackwell v. Nocerini*, 123 F.4th 479, 488 (6th Cir. 2024) (declining to consider public records used, not to confirm an undisputed fact, but to establish facts "subject to reasonable dispute"). In any event, at this stage the Court ought not "treat all information in the record as true." *Id.* Either way, these records do not help Martin's defense. For example, the 2021 records prove only that Martin made certain representations to the court that, at best, confirm Defendants filed objectively baseless claims and, at worst, are yet additional false statements made in furtherance of the fraud scheme. *See* Martin Mot. Exs. 2–3.

whether a party who filed suit was indifferent to obtaining a favorable judgment" for purposes of sham exception "may often be a difficult question of fact").[5] At this stage, the Court must determine whether, construing the allegations in the light most favorable to 3M, 3M adequately alleges Defendants filed "sham" lawsuits. *See, e.g.*, *Graham Packaging*, 2025 WL 978220, at *9; *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 643 (E.D. Mich. 2000). 3M has sufficiently done so. *See, e.g.*, *Ultraclear Epoxy, LLC v. Epodex USA Corp.*, 2024 WL 966876, at *11 (M.D. Tenn. Mar. 6, 2024) (finding claimant plausibly alleged sham exception applied and opposing party's assertions were not entitled to a presumption of truth at the motion-to-dismiss stage); *In re Cardizem*, 105 F. Supp. 2d at 643–44 (finding plaintiff sufficiently alleged both prongs of sham litigation test and declining to consider contradictory facts argued by defendant on Rule 12(b) motion); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *19 (E.D. Tenn. May 20, 2013) (same).

Whether Defendants' sham lawsuits are evaluated one-by-one or as serial fraudulent litigation, the *Noerr-Pennington* doctrine offers Defendants no refuge. Under the serial litigation framework, a plaintiff can demonstrate the sham exception applies by showing defendants brought a whole series of lawsuits "pursuant to a policy of starting legal proceedings without regard to the

---

[5] *See also, e.g.*, *Allergan, Inc. v. Revance Therapeutics, Inc.*, 2024 WL 5166648, at *5 (M.D. Tenn. Apr. 29, 2024) (finding "an assessment of the viability of the sham litigation exception, will involve extensive analysis based on facts that are not currently before the Court" and "is not appropriate (and likely not possible) at this [pleading] stage"); *EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, 2022 WL 992948, at *4 (E.D. Mich. Mar. 31, 2022) (acknowledging that "resolution of whether defendants' lawsuits and arguments in state court are objectively baseless would typically involve fact issues more appropriate for the fact finder" but finding exception did not apply as a matter of law because purported "sham" litigation was successful); *Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 118 F. Supp. 3d 646, 657 (D.N.J. 2015) ("[E]ven assuming the allegations proved insufficient, the inquiry into whether [plaintiff] maintains in this action 'objectively and subjectively baseless' infringement claims turns upon issues of reasonableness and intent—issues which are premature to consider upon the present record" and "cannot be resolved in the context of a motion to dismiss, and prior to discovery.").

merits and for the purpose of injuring [another]." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015).[6] Under this analysis, it does not matter that some claims in the series of lawsuits may have merit. What matters is that they are filed "as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment." *Id.* (quoting *USS-POSCO*, 31 F.3d at 811). 3M sufficiently alleges Defendants engaged in a pattern or practice which, as courts have recognized, "can inflict a crushing burden" on a party. *USS-POSCO*, 31 F.3d at 811; *see also Hanover 3201 Realty*, 806 F.3d at 180 (recognizing a series of lawsuits has "far more serious implications than filing a single action" because it "involve[s] more complex fact sets and a greater risk of … harm"); *Primetime 24*, 219 F.3d at 101 (finding plaintiff sufficiently alleged "automatic petitioning … without regard to and regardless of the merits" that "if proven, would be sufficient to overcome the … *Noerr-Pennington* defense"). 3M sufficiently alleges serial sham litigation.

**B.**    **By its own terms, *Noerr-Pennington* does not apply to the non-petitioning activity alleged in the Complaint.**

The *Noerr-Pennington* doctrine extends only to "petitioning" activity—that is, valid efforts to influence governmental action. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). This includes filing court documents in legal proceedings, provided the underlying lawsuit is not a sham. *VIBO*, 669 F.3d at 684. Some courts—though neither the Supreme Court

---

[6] *See also USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92 (2d Cir. 2000); *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354 (4th Cir. 2013); *CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276 (10th Cir. 2020). The First and Seventh Circuits have declined to apply this alternative test. *See P.R. Tel. Co. v. San Juan Cable LLC*, 874 F.3d 767 (1st Cir. 2017); *U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chi., Inc.*, 953 F.3d 955 (7th Cir. 2020).

nor the Sixth Circuit—have extended the doctrine also to pre-suit demand letters or threats of litigation. *See, e.g.*, *Ultraclear Epoxy*, 2024 WL 966876, at *10.

The scheme alleged in the Complaint goes further than just petitioning and demand letters. For example, 3M alleges that Defendants used various media outlets to conduct a yearslong, mass solicitation of coal workers in the Pikeville community who would become the first victims of their scheme. Compl. ¶¶ 52, 61–62. Before any claim was filed or even drafted, Hammond's employees told these coal workers and their families lies about potential life-changing payouts to induce their unwitting cooperation in the scheme. *Id.* ¶¶ 61–62. Defendants bullied and intimidated non-attorneys into going along with this ruse, including by manipulating dates and forging signatures on administrative records. *Id.* ¶¶ 63–68, 122–125, 141. And when the plot began to unravel, Hammond hid the evidence in a secret location. *Id.* ¶¶ 188–190. While all this deception and exploitation laid the groundwork for the fraud perpetrated by Defendants and concealed the conspiracy for as long as possible, none of it was essential to the actual filing or prosecution of claims against 3M.

Defendants offer no authority for expanding the boundaries of *Noerr-Pennington* protection to such conduct. In *Sosa v. DIRECTV, Inc.*—relied on heavily by Martin and Givens in their requests for immunity—the Ninth Circuit held that "the connection between presuit demand letters and access to the courts is sufficiently close" that restricting such prelitigation conduct would impair the right of access to the courts. 437 F.3d 923, 936 (9th Cir. 2006). The court explained that pre-suit invitations to negotiate claims "reduc[e] legal costs and facilitat[e] access to the courts" by streamlining any subsequent litigation, while restricting such communications when the same demand made in a court filing would be protected only "renders the entire litigation process more onerous." *Id.*

28

The *Sosa* rationale does not apply to the non-petitioning conduct here. Restricting conduct like mass recruitment of clients, forging administrative records, or concealing of evidence imposes no burden on Defendants' (or their clients') ability to access the courts for legitimate purposes. They are neither prerequisites to litigation nor protected by common-law litigation privileges. *See supra* Section III; *see also Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 484 F.3d 601, 613 (D.C. Cir. 2007) (rejecting extension of *Sosa* reasoning to activities "hav[ing] nothing at all to do with the right of 'access to the courts'" and that were "neither common features of litigation nor statutorily protected litigation privilege"). No court has extended the doctrine to such attorney conduct, including the district courts in this circuit that have adopted *Sosa*'s reasoning. *See, e.g.*, *Ultraclear Epoxy*, 2024 WL 966876, at *10 (declining to extend *Sosa*'s "breathing space" principle to copyright takedown notice that "is neither a threat, nor precondition to, litigation"); *Heritage Guitar*, 2022 WL 1954361, at *5 (applying doctrine to cease-and-desist letters); *Racetech, LLC v. Ky. Downs, LLC*, 169 F. Supp. 3d 709, 715 (W.D. Ky. 2016) (applying doctrine to pre-suit communications aimed at inducing litigation).

Thus, the *Noerr-Pennington* doctrine does not shield Defendants from liability because 3M's claims involve conduct the doctrine does not protect. *See, e.g.*, *Rondigo, LLC v. Township of Richmond, Michigan*, 2012 WL 1021726, at *4 (E.D. Mich. Mar. 27, 2012) (recognizing that applying *Noerr-Pennington* to entire complaint is not appropriate where not all claims involved petitioning activity).

## VI.    *Younger* abstention does not apply to 3M's claims.

Hammond's argument that *Younger* abstention requires dismissal of the Complaint "as a collateral attack on state court proceedings" also fails. *See* Hammond Mot. at 11. *Younger* abstention is appropriate only "when [a] state proceeding (1) is currently pending, (2) involves an important state interest, and (3) affords the plaintiff an adequate opportunity to raise constitutional

claims." *See Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 638 (6th Cir. 2007). It does not apply to 3M's claims. Notably, Martin and Givens appear to agree with 3M, or they assuredly would have joined Hammond's argument.

First, the dust mask civil suits filed against 3M do not involve "an important state interest." To the contrary, they are routine (other than their fraudulent nature, that is) civil lawsuits between private litigants. *Younger* abstention originated as a policy against federal court interference with state criminal prosecutions. *Sprint Comm'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). The Supreme Court has extended the doctrine to state civil proceedings that "are akin to criminal prosecutions" or "implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* at 72–73. Thus, while *Younger* abstention "has crept over time, it still applies only in limited circumstances": when there is (1) "an ongoing state prosecution," (2) "a civil enforcement proceeding that is akin to a state criminal prosecution," or (3) a "civil proceeding involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Plastic Surgeons of Lexington, PLLC v. Liberty Mut. Ins. Co.*, No. 5:18-CV-548-REW-MAS, 2021 WL 4184887, at *1 (E.D. Ky. Jan. 5, 2021) (quoting *Aaron v. O'Connor*, 914 F.3d 1010, 1016 (6th Cir. 2019)). Hammond's effort to shoehorn the dust mask claims into these criteria does not fit.

Hammond insists without any basis that state product liability claims involve important state interests requiring abstention. *See* Hammond Mot. at 12. Neither of the cases he relies on support his position. *See, e.g.*, *In re Emoral Inc.*, 740 F. 3d 875, 875 (3d Cir. 2014) (affirming bankruptcy court holding that personal injury actions are property of bankruptcy estate, with no discussion of *Younger*); *Gruttadauria v. Fazio*, 2007 WL 1100439 (N.D. Ohio Apr. 10, 2007) (dismissing for lack of subject matter jurisdiction and stating in dicta that arguments concerning binding effect of arbitration panel decision in state court proceedings involved important state

interests). Nor do the other authorities he cites, each of which involved a civil enforcement proceeding or the enforcement of state court orders. *See* Hammond Mot. 11–13 (citing *Carroll v. City of Mount Clemens*, 139 F.3d 1072 (6th Cir. 1998) (civil housing code enforcement action); *Watts v. Burkhart*, 854 F.2d 839, 844 (6th Cir. 1988) (state medical license suspension proceeding); *James v. Hampton*, 513 F. App'x 471, 475 (6th Cir. 2013) (state judiciary disciplinary proceedings); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987) (enforcement of state court judgment)). Hammond's square peg does not even come close to fitting this narrow round hole.

*Younger* abstention does not apply for the additional, independent reason that there is no parallel state action in which 3M could raise its affirmative claims against Defendants. Neither Hammond, Martin, nor Givens is himself a party to any dust mask lawsuit. *See Habich v. City of Dearborn*, 331 F.3d 524, 532 (6th Cir. 2003) ("Unless the issue in the plaintiff's federal suit would be resolved by the case-in-chief or as an affirmative defense to the state court proceedings that exist, it cannot be said that the state proceedings afford the federal plaintiff an adequate opportunity to have his or her claim heard for *Younger* purposes."). And while 3M has sought sanctions in certain individual cases, 3M has had no opportunity in those proceedings to bring the RICO and common law claims that are the subject of the Complaint here. 3M alleges in this case a widespread fraud scheme involving an entire inventory of cases in which Defendants coordinated litigation and other activities to deceive 3M, their individual clients across many complaints, and multiple courts. Rule 11 provides no remedy for such a wide-ranging fraud scheme across multiple proceedings, and Hammond is wrong to suggest it does.[7] *Younger* abstention simply does not apply. *See Habich*, 331 F.3d at 532.

---

[7] Hammond relies on *Saltire Industrial*, in which the Sixth Circuit acknowledged that conduct *not* amounting to fraud might be remedied under Rule 11—not the reverse, as he suggests. 491 F.3d

## CONCLUSION

The Court should deny the motions to dismiss.


Dated: November 14, 2025                    Respectfully submitted,


                                            FULTZ MADDOX DICKENS PLC

                                            /s/ Benjamin C. Fultz

                                            Benjamin C. Fultz (KBA #84398)
                                            Gregory Scott Gowen (KBA #85408)
                                            Robert E. Ranney (KBA #100226)
                                            101 South Fifth Street, 27th Floor
                                            Louisville, Kentucky 40202-3116
                                            (502) 588-2000
                                            bfultz@fmdlegal.com
                                            sgowen@fmdlegal.com
                                            rranney@fmdlegal.com

                                            Steve Grimes (admitted *pro hac vice*)
                                            Whitney I. Adams (KBA #100826)
                                            WINSTON & STRAWN LLP
                                            300 N. La Salle Dr., Suite 4400
                                            Chicago, Illinois 60654
                                            Tel.: (312) 558-5600
                                            Fax: (312) 558-5700
                                            sgrimes@winston.com
                                            wiadams@winston.com

                                            *Attorneys for 3M Company*

---

at 530–531. Hammond also misquotes *Saltire Industrial*. The Sixth Circuit did not hold, let alone suggest, that "[a]llowing a pursuit of a separate fraud or RICO claim 'violates fundamental principles of community, federalism, and respect for state courts.'" Hammond Mot. at 13. Rather, the Sixth Circuit said that "*asking the district court to find that a Tennessee state court is less efficient and more costly to the parties than a federal court based in Tennessee* violates fundamental principles of comity, federalism, and respect for state courts" (*Saltire Industrial*, 491 F.3d at 531 (emphasis added)). Hammond leaves out the italicized part from the quote.