# Exhibit 15



# MOTION HEARING



LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

schedule@kentuckianareporters.com
877.808.5856 | 502.589.2273
www.kentuckianareporters.com

```
 1     PIKE CIRCUIT COURT
 2        DIVISION II
 3  JUDGE HOWARD KEITH HALL
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15     MOTION HEARING
16
17
18
19
20
21
22
23
24
25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                           Page 2
1                    INDEX
2                                            Page
3   PROCEEDINGS                                3
4
5
...
25
```

```
                                           Page 3
1                  PROCEEDINGS
2
3       JUDGE HALL:  Oh, good -- good afternoon,
4   everyone.  Welcome to Pike Circuit Court, Division
5   number II.  We have quite a few folks on the Zoom
6   screen and quite a few folks in the gallery as well.
7   We have quite a few motions on the collective
8   cases -- referred to collectively as -- sometimes
9   as the dust mask cases.  Just reading through, I see
10  a -- the motions and I -- these are not in any
11  chronological order.  Motion for summary judgment as
12  to nine plaintiffs, and motion to sever the
13  plaintiffs' claims.  I see that on top of one.
14  Motion to any certain plaintiffs, I see that also
15  and I'll identify all the case numbers -- also, I'm
16  going in reverse order.  Motion for trial date on
17  one, trial -- one of them already says it's got a
18  trial date. Plaintiff's motion for trial, status
19  hearing, motion for new trial date, trial currently
20  set for June 27th.  Again, I'll read the case numbers
21  that we've got.  We've got different attorneys,
22  different issues, different defendants, different
23  plaintiffs, but generally speaking, some of the same
24  overriding issues, which we all know.  I'll read the
25  case numbers as I have them here -- 21-CI-646,
```

```
                                           Page 4
1   Hamilton 3M Company and others; 21- CI-820, Conley;
2   21-CI, George Norman -- not George Foreman, George
3   Norman; Glen Coleman, 22-CI-811; 21-CI- 322, Brian
4   Adams; Nathan Gibson, Mine Supply, several others,
5   19-CI-1056; Randy Adams, 20-CI-382; Lee Harmon,
6   20-CI-1120.  I'm sure there's other case numbers out
7   there.  I started out with about four or five and
8   then they're slowly gathering -- as we gather steam,
9   they're slowly getting other case numbers associated
10  with them. And with that in mind, I'll go ahead and,
11  as in the past, we've done pretty well letting the
12  parties address the issues.  You-all are way more
13  familiar with the files than I am at this moment,
14  and any particular order you-all want to address the
15  motions.  Mr. Salyers?
16      MR. SALYERS:  Our -- one --
17      JUDGE HALL:  We took you last so many times,
18  I'll bet you hopped up first.
19      MR. SALYERS:  Well, I think ours is easy.
20  We've got an agreed motion.
21      JUDGE HALL:  Okay.
22      MR. SALYERS:  We got with Mr. Miller and
23  Mr. Bender's client.  So that's the -- Lee Harmon,
24  that's the 20-CI-1120.  We're currently set for
25  trial on June the 27th.
```

```
                                           Page 5
1       JUDGE HALL:  June 27th.
2       MR. SALYERS:  There's -- there's one set the
3   day before and we've gotten together and agreed that
4   it might be good to go ahead and get a different
5   date for that.  That way, we're not --
6       JUDGE HALL:  Okay.  Triwana (phonetic), you got
7   the book?
8       MR. SALYERS:  I -- I believe we -- we submitted
9   a joint motion and a -- and an or -- maybe agreed
10  order if I'm not mistaken.
11      JUDGE HALL:  Hey, Triwana, you got the book?
12  Now, we got set these in a -- and a little trick to
13  it, I'm making --
14      CLERK:  What kind of hearing are you needing?
15      JUDGE HALL:  Jury trial.  We got to set it at a
16  time, place, and manner so it doesn't fall into one
17  of those other quarters.
18      MR. BENTLEY:  And -- and --
19      CLERK:  Does this one already have one in it?
20      JUDGE HALL:  It has a June 27th, but we're
21  going to lay it back for some time --
22      CLERK:  Okay.
23      JUDGE HALL:  -- in the future.
24      MR. BENDER:  In the -- in -- might I
25  suggest -- I've got the order in the Adams case that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14
1  MR. SALYERS: Thank you, Judge.
2  JUDGE HALL: Yes, sir.
3  MR. SALYERS: That's --
4  JUDGE HALL: Since we kept you last last time,
5  we'll let -- we'll do it in reverse order,
6  Mr. Salyers.
7  MR. SALYERS: That's okay.
8  UNIDENTIFIED FEMALE SPEAKER: September 30th
9  '24 or '23?
10  JUDGE HALL: All these are '24 dates.
11  UNIDENTIFIED FEMALE SPEAKER: That's what I
12  thought.
13  JUDGE HALL: Good deal. Okay. Moving along.
14  MR. MARTIN: Hey, Judge, how about I go next?
15  JUDGE HALL: Go right ahead.
16  MR. MARTIN: Judge, there -- there are a number
17  of things that are set on your docket today that
18  relate -- there are two groups of cases I'd split
19  apart:
20  cases that relate to Glenn Hammond and cases
21  that don't. Right now, I just filed two motions this
22  morning, which you haven't seen.
23  JUDGE HALL: Okay.
24  MR. MARTIN: I've been busy since your order in
25  the Johnny Wilson Case. And so, I want to just

Page 15
1  briefly tell you about the motion I had filed in the
2  Glenn Hammond cases, which is separate and distinct
3  from cases that we have motions on that don't relate
4  to Glenn Hammond. For example, Nate Gibson's case,
5  which is not a Hammond case. But let me just
6  briefly update you on the Hammond cases. After your
7  order was issued on the 9th of March, Johnny Givens,
8  my co-counsel, and I, traveled to Mr. Hammond's
9  office to begin preparing a -- a motion to
10  reconsider, essentially. We were going to do what
11  we thought we had to do to protect the Wilsons. At
12  that meeting on -- it was, I think, March 16th -- we
13  arrived at Mr. Hammond's office and began
14  investigating the -- the facts surrounding that
15  court order. And we had previously been provided,
16  by Mr. Hammond, on all of his cases, electronic
17  copies of everything. And we had been previously
18  told that we had been provided everything in those
19  files. And there was nothing that had been provided
20  to us in those files that we felt had -- had
21  jeopardized the Wilsons' rights. While we were
22  preparing and discussing with Mr. Hammond your order
23  of March 9th, we, by happenstance, by virtue of
24  a -- of a staff member who had a file in her hand,
25  who offered it to us, discovered that there are a

Page 16
1  large number of hard copy paper files on Mr.
2  Wilson's case and every other Hammond case. At that
3  meeting, we obtained -- Mr. Givens, who was talking
4  to this staff member, got the file folder out -- out
5  of her hand and started reviewing it. There's a lot
6  more to the story that's included in our motion, but
7  what we discovered that is specifically unique to
8  the Wilson matter is that we had been provided an
9  intake sheet that was dated March 10th of 2018,
10  which we thought was related to a medical fee
11  dispute that we discussed at the last hearing with
12  Mr. Miller.
13  MR. GIVENS: May 10, 2018.
14  MR. MARTIN: May 10th, thanks. I -- I continue
15  to do that. Thank you, Johnny. And we saw this
16  hard copy file and Johnny opened the file and yes,
17  the hard copy of the intake form that had been sent
18  to us was there and it was a generic typewritten
19  form. It was hard to tell what it was related to.
20  It said breathing problems, and that was the date we
21  were working for -- from May 10th of 2018, which we
22  thought was this workers' compensation dispute. On
23  the back -- paperclipped to the back of that intake
24  sheet was a handwritten copy of the same intake
25  sheet that had dust mask written at the top of it

Page 17
1  with a contingent fee contract attached to the back
2  of it for a product liability case, which we had
3  never seen before, which confirmed to us that your
4  order of March 9th was correct. Learning that your
5  order of March 9th was correct, even though we were
6  unaware of these written documents and these hard
7  copy documents, we asked this staff person who had
8  this file folder in her hand if there were other
9  folders, and she directed us to this back room where
10  there was a room full of hard copy file folders that
11  we had never seen, didn't know existed. The
12  following day, we -- we talked to Mr. Hammond about
13  this. We were running out of time that day. We had
14  -- the following day, we had a meeting with the
15  Wilsons that we thought was very important to keep.
16  We had obligations that weekend to fly back. So we
17  told Mr. Hammond that week that, look, we didn't
18  know about these hard copy files. We didn't know
19  they existed, we didn't know about this room, we
20  didn't know about the fact that you hadn't disclosed
21  everything to us in the Wilson case, and we've got
22  to come back. You have to keep these files in place
23  and preserve them and we're coming back to look at
24  them. The next morning, we met with the Wilson
25  family, very tough meeting to have. And then, we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1  had to fly back -- I had a wedding on Saturday to go
2  to and Johnny had an obligation.  And then the
3  following week, we came back up to look at these
4  files, which was this week, and we arrived on
5  Wednesday morning to begin our review of these
6  files, of which there are a considerable number.
7  We started reviewing these files, starting with the
8  Randy Adams case, and we began to realize that this
9  issue was not isolated to the Wilson file -- that
10 there are other claims with other documentation that
11 we had not seen, indicating that limitations have
12 likely expired on a number of cases. The files were
13 too voluminous for us to get through in an entire
14 day, so we decided that we were going to box these
15 files up, transport them by UPS to Houston, where I
16 would them copied and scanned so that they would be
17 preserved, and we would finish our review there.
18 That seemed to be a sound plan.  We arrived the next
19 morning, which was yesterday, at Glenn's office to
20 pick up those files and send them to UPS and also
21 begin meeting with other clients who we had to
22 inform had statute of limitations blown on their
23 case.  At that -- that morning, Glen told us that he
24 could not give us the files, that his insurance
25 counsel had intervened and told him that they would

Page 19

1  not allow him to give us the files.  It was a rather
2  heated and tense morning, and I was very upset and I
3  was trying to convey to Mr. Hammond that my interest
4  was in the clients and protecting their rights and
5  not his.  Nonetheless, he sought an opinion from the
6  Kentucky Ethics Counsel.  He send that -- sent that
7  request in writing, which has been attached to an
8  exhibit to this motion, and Kentucky Ethics Counsel
9  responded to him in orally -- orally to him and the
10 -- the end result was that he kept the files with
11 the understanding that his lawyers -- his insurance
12 lawyers are going to obtain the files, preserve
13 them, copy them, send these copies to Mr. Givens and
14 I.  The reason I'm telling you this story is because
15 there are matters on the court's docket today that
16 are involved in this group, and there may be other
17 matters in the future, and that neither Mr. Givens
18 or I want to be involved in the prosecution of any
19 case that was fraudulently filed or not filed
20 because of documentation that was not disclosed to
21 us by Mr. Hammond.  This documentation appears to be
22 significant.  From what we could tell in our
23 short-term review of these files, there are
24 contingent fee contracts dating back as early as
25 2016. There are intake sheets dating back that early

Page 20

1  on other cases and it -- knowing that, neither
2  Mr. Givens nor I can prosecute these cases at the
3  present time until we've had an opportunity to
4  review these files and determine whether -- and
5  which ones, if any, are viable cases and then take
6  steps to have dismissed, with prejudice, any of
7  those cases that are not viable.  So we have filed a
8  motion to stay, which is technically not set on the
9  court's docket today, but I can tell you that
10 Mr. Givens and I are very, very upset about this.
11 This has not happened to me in the history of
12 my -- history of my practice in law.  So -- sorry,
13 Your Honor.  On Ham -- Hammond group, we're going to
14 move to stay so that we could get those files under
15 control.  And so, the only things that we really
16 would like to visit with you about today are the
17 Nate Gibson file, and I believe Johnny has another
18 motion he filed, but -- but that circumstance I
19 needed to immediately bring to your attention, been
20 working on these motions all morning.  I've got them
21 filed in the Randy Adams case and the Brian Adams
22 case. I have to get them filed in the other cases
23 across the State of Kentucky, so that we can see how
24 to manage this problem.
25      JUDGE HALL:  That's quite a bit.  Anything

Page 21

1  else -- any other counsel -- anything -- weigh in on
2  where we should go from here?
3       MR. MILLER:  Well, I just saw, Your Honor --
4  Byron Miller from 3M.  I just saw the motion that
5  they filed, and I didn't read it in detail because I
6  was getting ready for this hearing, but I got them
7  just --
8       JUDGE HALL:  You got them before I did.  I
9  can't get them because we can't -- they have to be
10 approved to file here before I can even get them, so
11 you're ahead of me.
12      MR. MILLER:  So -- so, Your Honor, what -- just
13 to --
14      JUDGE HALL:  The technology everywhere you --
15 the world of technology, you're getting them before
16 I do.
17      MR. MILLER:  Yeah.  We -- we get the electronic
18 file and we're able to open it up, so...
19      JUDGE HALL:  Right.
20      MR. MILLER:  I -- I did go through it in a
21 cursory fashion, and it appears that Mr. Martin has
22 summarized what is contained in the -- the motion
23 and this history of facts surrounding what -- what
24 they discovered when they went to -- to
25 Mr. Hammond's office. However, I understand that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  Mr. Martin's upset, but, you know, frankly, I -- I'm
2  upset too because, you know, I've got a client that
3  has spent an enormous amount of time and resources
4  defending these cases that they have vigorously
5  asserted and there's -- and we have advised this
6  court -- we advised other courts that we believe
7  many of these cases are time-barred based on the
8  statute of limitations.  And I do take exception to
9  what Mr. Martin says that somehow, the only way that
10 these cases are time-barred is because of
11 malfeasanced or misconduct by Mr. Hammond.  I would
12 agree that it appears that what they just disclosed
13 to you and -- and documents that they have
14 discovered in Mr. Hammond's office appears to be
15 egregious misconduct by Mr. Hammond.  Nevertheless,
16 it doesn't change the fact that Mr. Wilson and many
17 other plaintiffs were diagnosed with black lung
18 decades and years before they filed the lawsuit and
19 the cases are time-barred based on constructive
20 knowledge.  But the thing that also strikes me is
21 that Your Honor correctly determined, based on the
22 documents that we submitted to the court months ago,
23 that that affidavit by Mr. Hammond was false and it
24 was materially false. You made that determination,
25 not based on some document that Mr. Martin just

Page 23

1  found two days ago at Mr. Hammond's office, but
2  documents that were obvious -- patently obvious on
3  their face that we produced to the court. When
4  Mr. Martin and Mr. Givens were confronted with those
5  documents that clearly indicated that that affidavit
6  was false, they doubled-down and they told --
7  Mr. Martin told the court in -- in -- in open court,
8  that that affidavit was good and sound.  And so,
9  I've got a real problem with them coming in
10 and -- and I understand they're throwing Mr. Hammond
11 under the bus and I understand that there's a lot of
12 misconduct there, but to suggest that somehow --
13 that they didn't know, had no idea that this was
14 false, strikes me as a little bit too late because
15 the court already made a proper determination on
16 evidence that was before the court and before
17 Mr. Hammond and before Mr. Givens indicating that
18 affidavit was false.  So we do need to get to the
19 bottom of this, but I -- I'm -- I -- I am concerned
20 in many ways as to how this has unfolded and the
21 facts that are going to get unfolded and the
22 documents that are going to get discovered going
23 down the road.
24     MR. MARTIN:  Well, I would just point out that
25 if there hadn't have been $233,000 worth of workers'

Page 24

1  compensation insurance denials the year that Mr.
2  Hammond filed this case, I would agree with Mr.
3  Miller, but that was pretty good camouflage, which
4  Mr. Hammond was hiding behind, that led me to
5  believe that he truly was working on a workers'
6  compensation insurance fee dispute that earlier
7  year.  It certainly was a good faith argument based
8  upon what my own client had told me, Ms. Wilson, who
9  had said yeah, she had gone to Mr. Hammond
10 and -- and -- and he was working on that matter of
11 the workers' compensation fee disputes for the
12 Wilson family.  So I had independent corroborating
13 evidence from both the workers' comp carrier records
14 that were provided showing these denials, which were
15 extraordinary -- it's a lot of money, $230,000 --
16 and Ms. Wilson's own testimony, but it was also
17 pretty good camouflage for Mr. Hammond to hide
18 behind and that's what was happening.  We could take
19 that up later.  I -- I understand Mr. Miller's
20 argument about the statute of limitations, which is
21 a legal one and -- and I know he's going to make
22 that and I respect that he has made that in the
23 past, and I certainly respect Mr. Miller's concern
24 for his client. I -- it has never -- never was the
25 intent of Mr. Givens or myself to handle claims that

Page 25

1  were not in good faith or not viable and we want to
2  stop that immediately and fix it.  And so, my -- my
3  challenges are going to be, Judge, when I get these
4  files -- and I got to get them and I -- I find
5  myself in a apparent dispute with insurance defense
6  lawyers, but as soon as I know what the status of
7  those files are and when I'm going to get copies,
8  I will inform both the court and Mr. Miller as well
9  as counsel for MSA and counsel for American Optical,
10 and counsel for the distributor defendants,
11 Mr. Gault (phonetic), so that they will know
12 firsthand, you know, what -- what we're dealing with
13 and what our schedule is, and we want to seek
14 immediate dismissals. I don't know if I'm even going
15 to stay involved in this product -- project.
16 I don't -- and neither does Mr. Givens.  Neither one
17 of us have ever had this experience, nor do we want
18 to be involved with lawyers who -- who conduct
19 themselves in this manner.  It -- as a -- will at
20 least be a condition that Mr. Hammond no longer be
21 involved in these cases before I stay involved,
22 number one, and number two, if there's any chance of
23 our remaining involved, it's going to have to be
24 with some understanding that, if he makes any fee,
25 it goes into some fund to help these people who have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com